**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**John Stephen WILSON,**
**Defendant–Appellant.**

No. 89–50236.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 8, 1990.

Decided April 6, 1990.

Denise Meyer, Deputy Federal Public Defender, Los Angeles, Cal., for defendant-appellant.

Adam B. Schiff, Asst. U.S. Atty., Los Angeles, Cal., for plaintiff-appellee.

Before FARRIS, BOOCHEVER and NOONAN, Circuit Judges.

BOOCHEVER, Circuit Judge:

John Stephen Wilson appeals his sentence for mail fraud. He challenges the Sentencing Guidelines, claiming they violate his due process rights by requiring the district court to make findings without considering the reliability of the underlying facts and without requiring that those facts meet any articulated standard of proof.[1] We find that the Guidelines do not violate due process on these grounds. Wilson also challenges his sentence under the Guidelines, claiming that the district court, in applying § 2F1.1, incorrectly computed the value of the loss to the company Wilson attempted to defraud. We disagree and affirm the district court's decision.

## FACTS AND PROCEDURAL HISTORY

Wilson was employed as a research associate with Amgen, Inc., a biotechnology and pharmaceutical firm. As a condition of employment, Wilson agreed to keep the company's research and discoveries confidential. Wilson nevertheless photocopied documents containing Amgen's financial information and research data on its process for producing erythropoietin, a human hormone that stimulates the production of red blood cells. On June 22, 1988, Wilson mailed a letter to Genetics Institute, Amgen's chief competitor, offering to sell these documents for $150,000 or 10,000 shares of Genetics Institute stock. He signed his name as "Pimpernel" and provided a self-addressed envelope with the name "D. Wallace" as the return addressee/sender.

Genetics Institute received Wilson's letter and contacted Amgen, informing Amgen of the existence of the letter and its contents. Amgen, in turn, contacted the FBI, whose agent arranged to meet with Wilson to exchange the documents for $150,000 in cash. Wilson also told the agent he had additional information he was willing to sell for $50,000. On August 11, 1988, Wilson met with the undercover agent and exchanged the documents for what he believed was $200,000 in cash. He was then arrested.

On December 12, 1988, Wilson pled guilty to one count each of mail fraud and use of a fictitious name in a mail fraud scheme in violation of 18 U.S.C. §§ 1341 and 1342 (1982). Wilson was sentenced on April 10, 1989. To calculate Wilson's sentence under Guidelines § 2F1.1, the district

---

1. Wilson also claims that the Sentencing Guidelines offend due process by restricting the sentencing court's discretion and infringing a defendant's right to an individualized sentence. Our recent decision in *United States v. Brady*, 895 F.2d 538 (9th Cir.1990), however, precludes this claim.

court was required to determine the value of the materials he attempted to sell. The court considered the presentence report, defense and government exhibits, and testimony of expert witnesses, and determined that the value of Amgen's documents was $1 million. From the resulting Guideline range of 15 to 21 months, the court sentenced Wilson to 15 months in custody to be followed by three years of supervised release.

## DISCUSSION

### I. Due Process

Wilson relies on the district court opinion in *United States v. Davis*, 715 F.Supp. 1473 (C.D.Cal.1989), to support his constitutional claims. In *Davis*, the court held that the Guidelines unconstitutionally mandate periods of imprisonment "based on factors which, for the most part, the sentencing judge is required to apply on the basis of any available information, whether or not that information was introduced at trial or proved beyond a reasonable doubt." *Id.* at 1476. Wilson makes the same two claims: 1) The Guidelines do not allow the sentencing court to consider the reliability of the available evidence and determine the weight to be given the applicable sentencing factors, and 2) the Guidelines do not require that facts underlying sentencing factors be proved beyond a reasonable doubt. The constitutionality of the Guidelines is a question of law which we review de novo. *United States v. Brady*, 895 F.2d 538, 539 (9th Cir.1990).

### *Reliability of Sentencing Information*

■ Wilson argues that the Guidelines mandate periods of incarceration based on findings that the sentencing court is required to make on the basis of whatever information is available regardless of the reliability of that information. "In the exercise of [traditional] sentencing discretion,

judges adjust[ed] the weights of the sentences to reflect the differences in the relative certainty of information on which the sentences are based." *Davis*, 715 F.Supp. at 1477. By eliminating that discretion, Wilson maintains, the Guidelines violate due process.

Wilson overstates the requirements of the Guidelines. They do not require the sentencing court to impose base level adjustments regardless of the reliability of the applicable facts. Rather, the Guidelines require the district court to "[d]etermine the base offense level and apply any *appropriate* specific offense characteristics" and "adjustments *as appropriate* related to victim, role, and obstruction of justice" as well as acceptance of responsibility and criminal history. United States Sentencing Commission, *Guidelines Manual* § 1B1.1(b), (c), (e), and (f) (emphasis added). We interpret the Commission's use of the word "appropriate" to mean that the district court should apply only those factors for which sufficiently reliable information exists. When the court is not satisfied that the evidence supporting the application of a particular factor is reliable, the court should find that the factor has not been established and not apply it.[2]

"In the sentencing context, '[d]ue process requires that a defendant be given an opportunity to assure the accurate presentation of reliable sentencing information to the district court.' " *Brady*, 895 F.2d at 542 (quoting *United States v. Romano*, 825 F.2d 725, 728 (2nd Cir.1987)). This does not include the right to have a sentence weighed according to a sliding scale of factual certainty or reliability. Therefore, to the extent that the Guidelines remove the discretion of the sentencing court to adjust the weights of sentences to reflect the differences in the relative certainty of information on which the sentences are

---

**2.** The *Davis* court rejected this argument, claiming that, "as to major factors which affect substantial periods of incarceration, when the matter is genuinely unclear, the all-or-nothing solution proposed by the Government produces more obvious and profound relative injustice than could be produced under the exercise of

unfettered discretion, except in cases of clear abuse." 715 F.Supp. at 1481 n. 33. We disagree. Partially applying a sentencing factor to reflect a lack of sufficiently reliable supporting information would result in more injustice than finding that the factor has not been established and not applying it at all.

based, the Guidelines do not violate due process.

*Standard of Proof*

Wilson claims, as did the district court in *Davis,* that "[t]he Due Process Clause commands that Congress may not require that any person be incarcerated for a fixed period directly attributable to a specific fact determination unless proved beyond a reasonable doubt." *Davis,* 715 F.Supp. at 1477. Therefore, according to Wilson and the *Davis* court, "[i]f Congress desires to fix specific sentencing lengths in advance of the commission of crimes, it must also fix the standard of proof. For that purpose there is only one Constitutional standard: proof beyond a reasonable doubt." *Id.* (footnote omitted).

The Supreme Court, however, has "rejected the claim that whenever a State links the 'severity of punishment' to 'the presence or absence of an identified fact' the State must prove that fact beyond a reasonable doubt." *McMillan v. Pennsylvania,* 477 U.S. 79, 84, 106 S.Ct. 2411, 2515, 91 L.Ed.2d 67 (1986) (quoting *Patterson v. New York,* 432 U.S. 197, 214, 97 S.Ct. 2319, 2329, 53 L.Ed.2d 281 (1977)). The Court in *McMillan* held that "States may treat 'visible possession of a firearm' as a sentencing consideration rather than an element of a particular offense," and that they may require that such possession be proved by only a preponderance of the evidence: "Pennsylvania has deemed a particular fact relevant and prescribed a particular burden of proof. We see nothing in Pennsylvania's scheme that would warrant constitutionalizing burdens of proof at sentencing." *Id.* 477 U.S. at 91–92, 106 S.Ct. at 2419.

*McMillan* upheld the constitutionality of a preponderance of the evidence standard in the context of sentencing under state law, but there is "no principled reason to distinguish in this respect a state sentence from one imposed in federal court." *United States v. Lee,* 818 F.2d 1052, 1057 (2nd Cir.), *cert. denied,* 484 U.S. 956, 108 S.Ct. 350, 98 L.Ed.2d 376 (1987). Other circuit courts of appeals, relying on *McMillan,* have held that facts underlying Guidelines

sentencing factors need not be proved beyond a reasonable doubt to satisfy due process. *See United States v. McDowell,* 888 F.2d 285, 290–91 (3rd Cir.1989); *United States v. Guerra,* 888 F.2d 247, 250–51 (2nd Cir.1989); *United States v. Ehret,* 885 F.2d 441, 444 (8th Cir.1989), *cert. denied,* — U.S. —, 110 S.Ct. 879, 107 L.Ed.2d 962 (1990); *United States v. Urrego-Linares,* 879 F.2d 1234, 1237–38 (4th Cir.), *cert. denied,* — U.S. —, 110 S.Ct. 346, 107 L.Ed.2d 334 (1989); *United States v. Wright,* 873 F.2d 437, 441 (1st Cir.1989). We agree.

A convicted criminal defendant unquestionably retains some due process rights, but "[o]nce the reasonable-doubt standard has been applied to obtain a valid conviction, 'the criminal defendant has been constitutionally deprived of his liberty to the extent that the State may confine him.'" *McMillan,* 477 U.S. at 92 n. 8, 106 S.Ct. at 2419 n. 8 (quoting *Meachum v. Fano,* 427 U.S. 215, 224, 96 S.Ct. 2532, 2538, 49 L.Ed.2d 451 (1976)).

> The maximum length of the deprivation of liberty has also been determined legislatively. Thus, all that is left to determine at sentencing is where in the permissible zone the defendant's sentence will fall. Although this decision can be, and most often is critical, it is rarely ever as crucial as the initial decision finding guilt.

*McDowell,* 888 F.2d at 290.

A defendant's due process rights at sentencing are limited, therefore, but include "the right not to have his sentence based upon 'materially false' information." *Id.* (citing *Townsend v. Burke,* 334 U.S. 736, 741, 68 S.Ct. 1252, 1255, 92 L.Ed. 1690 (1948)); *accord United States v. Columbus,* 881 F.2d 785, 787 (9th Cir.1989). Such a right, however, does not require a sentencing court to make factual determinations beyond a reasonable doubt. "Determining that information is not materially false does not require any type of heightened scrutiny. It is enough that the sentencing judge is convinced that the disputed fact, as alleged, is true." *McDowell,* 888 F.2d at 291; *accord United States v.*

*Fernandez–Vidana,* 857 F.2d 673, 675 (9th Cir.1988) (pre-Guidelines). Indeed, as the Supreme Court observed in pre-Guidelines sentencing, "[s]entencing courts have traditionally heard evidence and found facts without any prescribed burden of proof at all." *McMillan,* 477 U.S. at 91, 106 S.Ct. at 2419.

Prior to the Guidelines' promulgation, however, district courts employed a gestalt approach to sentencing where a single factual determination rarely had a sufficiently significant impact on the overall sentence to warrant an appeal. "The Guidelines, though, in an attempt to reduce disparities and improve fairness in sentencing, have imposed a scheme by which a single factual determination could significantly affect the prescribed sentence." *McDowell,* 888 F.2d at 290. We believe under these circumstances that a defendant's due process right to ensure the reliability of information used at sentencing includes the requirement that facts underlying sentencing factors be proved according to a specified standard of proof.

> Without a definite and required burden of proof there can be no real assurance that the information relied upon is accurate. Nor can there be intelligible review of a claim on appeal that at sentencing procedural due process was denied.... Most significant, having a definite standard will go far towards eliminating the risk of an erroneous deprivation of a defendant's liberty interest and thus satisfies his or her due process rights.

*Lee,* 818 F.2d at 1056 (citation omitted).

The Guidelines themselves do not establish a standard of proof to ensure that sentencing information is not materially false. They require only that information used in sentencing have "sufficient indicia of reliability to support its probable accuracy." *Guidelines Manual* § 6A1.3(a). The other circuit courts of appeals that have chosen to impose a standard of proof in Guidelines sentencing have uniformly held that, to satisfy due process, facts underlying federal Guidelines sentencing must be proven by a preponderance of the evidence. *See McDowell,* 888 F.2d at 291; *Guerra,* 888 F.2d at 251; *Urrego–Linares,* 879 F.2d at 1238; *Wright,* 873 F.2d at 441.

Wilson argues that " 'preponderance of the evidence' has no consistent definition for Guideline purposes. It appears the standard is no more than that the relevant fact is deemed more likely true than not on the basis of the available information—no matter how limited or unreliable." *Davis,* 715 F.Supp. at 1481. We share these concerns but must recognize that they do not rise to the level of constitutional infirmity. In light of the Supreme Court's conclusion in *McMillan* that preponderance of the evidence satisfies due process, we cannot say that a more stringent standard of proof is constitutionally mandated.[3] We hold, therefore, that district courts are constitutionally required to make factual determinations underlying application of the Guidelines by at least a preponderance of the evidence. As so interpreted, the Guidelines do not violate due process.

■ Wilson alleges, however, that even if the Guidelines do not violate due process on their face, they have violated his due process rights as applied to him. He maintains that the district court's computation of the value of Amgen's documents "was a rather rough-and-ready guess on what the evidence showed would be the intended loss," at which the court arrived without articulating or using a standard of proof for that evidence.

Wilson correctly asserts that the district court did not articulate a standard of proof for the facts underlying its application of Guidelines § 2F1.1. The court, however, used at least a preponderance of the evidence standard to reach its decision. Both parties submitted a substantial amount of evidence on the value of the documents. Rather than relying solely on evidence of

---

3. Wilson challenges only the constitutional standard of proof required under the Guidelines. We limit our decision, therefore, to the minimum standard of proof necessary to satisfy constitutional due process requirements. We do not decide, however, whether a higher standard of proof may be required on other grounds.

the victim's estimate of the value of the intended loss, the court considered all the evidence and reduced that value accordingly. As the court explained, "although the guideline permits sentencing on the basis of we will say the best available information as long as it is reasonably reliable, you know, I think where there is doubt I have to find in favor of the defendant." The court expressly relied on only reliable evidence to determine the value of the loss and resolved any doubts about the reliability and use of the available information in favor of Wilson. The Guidelines as applied to Wilson, therefore, did not violate his due process rights.

## II. Guidelines § 2F1.1

Wilson challenges the district court's application of Guidelines § 2F1.1. He claims that the court incorrectly computed the value of the documents he took from Amgen. We give due deference to the district court's application of the Guidelines to the facts. *United States v. Sanchez–Lopez,* 879 F.2d 541, 557 (9th Cir.1989); 18 U.S. C.A. § 3742(e) (West Supp.1989). We review the district court's legal interpretations of the Guidelines de novo, *United States v. Restrepo,* 884 F.2d 1294, 1295 (9th Cir.1989), and its factual determinations made in the course of applying the Guidelines for clear error. *United States v. Wills,* 881 F.2d 823, 827 (9th Cir.1989).

### Actual v. Intended Loss

■ Section 2F1.1 of the Guidelines establishes a base level of six for offenses involving fraud and deceit. *Guidelines Manual* § 2F1.1(a). That base level must be increased "if the loss exceeded $2,000." *Id.* § 2F1.1(b)(1). Before its revision effective June 15, 1988, § 2F1.1(b)(1) provided for an increase in the offense level if the *"estimated, probable, or intended"* loss exceeded $2,000. *See id.* Appendix C ¶ 30 (1988) (emphasis added). Wilson argues that the elimination of the words "estimated, probable, or intended," from § 2F1.1 substantively altered this section. He maintains that, unlike former § 2F1.1, the amended § 2F1.1 requires that a victim suffer an *actual* loss before the base level

of the offense must be increased. He thus attempts to distinguish *United States v. Wills,* 881 F.2d 823, 827 (9th Cir.1989), in which this court, interpreting former § 2F1.1, rejected the very argument Wilson makes here.

Wilson's argument is without merit. While the amendment eliminated the words "estimated, probable, or intended" from the guideline, it added a reference to the definition of "loss" contained in the Commentary to § 2B1.1. *Id.* Appendix C ¶ 30. Thus, the Commission eliminated three words modifying "loss" from the guideline in favor of the more detailed explanation of "loss" in the Commentary. Moreover, the Commission retained the language in the Commentary providing that "[i]n keeping with the Commission's policy on attempts, if a *probable or intended* loss that the defendant was attempting to inflict can be determined, that figure would be used if it was larger than the actual loss." *Id.* § 2F1.1 (Application Note 7) (emphasis added). The meaning of "loss" in § 2F1.1, therefore, has not changed since our interpretation in *Wills.* The district court correctly determined that it was required to consider the intended loss to Amgen in applying the base offense level increases in § 2F1.1(b).

### Valuation of Loss

■ The district court began its computation of the value of Amgen's intended loss with the company's estimate of $8 million. This estimate roughly reflected Amgen's research and development costs for the information contained in the documents. The court reduced this figure by half because approximately half of the material was protected by patent and valueless to a nonpatent holder. Giving Wilson the benefit of every doubt arising from the "ball park estimate" of value provided by Amgen, the court further reduced the remaining $4 million by 75 percent to $1 million. The court, in fairness to the Government, refused to reduce this amount any further and used the $1 million figure to increase Wilson's offense level.

Wilson challenges this computation. As a legal matter, he argues that the district court was required to use the fair market value of the documents to determine his sentencing level. Under § 2F1.1, the value of the intended loss is determined according to the Commentary to § 2B1.1. *United States v. Burns*, 894 F.2d 334, 335–36 (9th Cir.1990); *Guidelines* § 2F1.1 (Application Note 7).

> "Loss" means the value of the property taken, damaged, or destroyed. *Ordinarily*, when property is taken or destroyed the loss is the fair market value of the particular property at issue. *Where the market value is difficult to ascertain* or inadequate to measure harm to the victim, *the court may measure loss in some other way*, such as reasonable replacement cost to the victim.

*Guidelines* § 2B1.1 (Application Note 2) (emphasis added). On their face, the Guidelines provide for alternatives to using a fair market value approach to valuing property and do not require the district court to use only the fair market value when that value is difficult to ascertain.

Wilson seems to recognize this, but nevertheless argues that the fair market value was ascertainable in this case. He claims that the court should have used the Seventh Circuit's method for determining the fair market value of stolen property: the amount a willing buyer (Genetics Institute) would pay a willing seller (Wilson). *See United States v. Bakken*, 734 F.2d 1273, 1278 (7th Cir.1984). Genetics Institute's President said he would not have paid more than $100,000 to $200,000 for the documents and Wilson was willing to sell them for $200,000. As a result, Wilson argues, the court could have easily determined the fair market value and therefore was obligated to do so.

We disagree. The Ninth Circuit has refused to require a strict market value approach in determining the value of stolen goods. *See United States v. Drebin*, 557 F.2d 1316, 1331–32 (9th Cir.1977) (finding that prices paid on the black market did not necessarily reflect the actual value of the stolen property), *cert. denied*, 436 U.S. 904, 98 S.Ct. 2232, 56 L.Ed.2d 401 (1978). This policy is particularly appropriate in the context of the Guidelines because "value" under the Guidelines "is an indicator of both the harm to the victim and the gain to the defendant." *Guidelines* § 2B1.1 (Background). A strict market approach measures only the gain to the defendant while virtually ignoring the harm suffered by the victim. *See United States v. Berkwitt*, 619 F.2d 649, 658 (7th Cir.1980) (applying a retail "thieves market" price in the belief that such a value reflects the only profit margin the defendants could have obtained). In light of these considerations and the Guidelines' provision for other methods of valuation, we reject a strict market valuation approach under the Guidelines and reiterate that "where goods have no readily ascertainable market value, 'any reasonable method may be employed to ascribe an equivalent monetary value to the items.'" *Drebin*, 557 F.2d at 1331 (quoting *United States v. Lester*, 282 F.2d 750, 755 (3rd Cir.1960), *cert. denied*, 364 U.S. 937, 81 S.Ct. 385, 5 L.Ed.2d 368 (1961)).

As the district court recognized, the figures Wilson advocates are relevant in a market for industrial espionage, but not necessarily in an open market: "In my view stolen information always commands less than legitimate information so I think in terms of market value it has got to be many times higher." Yet the district court was faced with a virtually nonexistent open market. The evidence presented by both Wilson and the Government illustrated the uniqueness of the information and the limited application such information would have, even to one of the few companies who could make any use of it. It was not clearly erroneous for the district court to find that market value was difficult to ascertain in these circumstances. Moreover, we give due deference to the court's decision to measure Amgen's loss according to the company's development costs and find that the court's computation under a development cost analysis also was not clearly erroneous.

## CONCLUSION

The Sentencing Guidelines did not violate Wilson's due process rights, either facially or as applied. We interpret the Guidelines, however, to require that the sentencing court find facts underlying the applicable sentencing factors by at least a preponderance of the evidence to satisfy the constitutional demands of due process. In addition, Guidelines § 2F1.1 is not limited to a victim's actual loss, but requires the district court to consider the intended loss to the victim to reach a proper valuation and sentence level increase. Nor is the district court limited to a strict market valuation of loss under § 2F1.1. When, as here, market value is difficult to ascertain, the court may use any reasonable method to measure the loss to the victim. Under the circumstances of this case, assessing the company's development costs was a reasonable method of measuring the intended loss to Amgen.

AFFIRMED.