914 F.2d 249
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
John David MOSS, Defendant-Appellant.
 No. 90-5752.
 United States Court of Appeals, Fourth Circuit.
 Argued July 17, 1990.
Decided Sept. 13, 1990.
 
 Appeal from the United States District Court for the Western District of Virginia, at Roanoke. James C. Turk, Chief District Judge. (CR-89-21-R)
 William H. Cleaveland, Rider, Thomas, Cleaveland, Ferris & Eakin, Roanoke, Va., for appellant.
 Karen Breeding Peters, Assistant United States Attorney, Roanoke, Va. (Argued), on brief: John P. Alderman, United States Attorney, Jean M. Barrett, Assistant United States Attorney, Roanoke, Va., for appellee.
 W.D.Va.
 AFFIRMED.
 Before ERVIN, Chief Judge, and PHILLIPS and MURNAGHAN, Circuit Judges.
 PER CURIAM:
 
 
 1
 John Moss appeals from his conviction for theft and conspiracy in connection with his business as a rebuilder of cars from salvaged vehicles. The jury convicted him of knowingly ordering and then purchasing stolen parts or "clips" of cars and then using those parts in his rebuilding business.[1] Moss has questioned the sufficiency of the evidence, an evidentiary ruling by the court, the jury instructions, and several sentencing issues. We affirm.
 
 I.
 
 2
 Prior to the case presently on appeal, Moss was convicted and sentenced for his participation in a "salvage switch" operation. In that scheme, Moss bought late model stolen cars, removed their identifying numbers, and replaced them with the numbers of wrecked or salvaged cars that he bought at auction. While free pending the ultimately unsuccessful appeal of that conviction, Moss went to an auction in Brandywine, Maryland, in November 1984. At that auction ("the Brandywine incident"), police seized a clip from Moss that he had just paid for and received. The clip seized was missing its identifying numbers and thought by the police to be stolen. Moss gave the police his receipt which identified "Willie" of "Foreign Salvage" as the sender. The police questioned Moss at the time. Though he turned over his receipt for the part, Moss gave no information regarding how the police could locate "Willie". The phone number on the receipt was inoperable and there was nothing identifying the address on it. Moss, however, knew how to contact Willie, otherwise known as Mark Williamson, but did not tell the police that information, allegedly because they did not ask. Moss later did call Williamson at home, asking him if Williamson had a salvage certificate for the seized part. As the part was stolen, obviously, no legitimate documentation was available. Williamson told Moss not to worry, that he would replace the clip, which he later did. Though Williamson did not tell Moss that the part was stolen, Williamson, as a cooperating government witness at Moss' trial, testified that Moss "should have known" that the parts were stolen.
 
 
 3
 When the police visited Moss some six months later to show him a photo spread, they still had not found Williamson. Moss did not tell them about his contacts with Williamson regarding the seized clip and its replacement.
 
 
 4
 After Moss completed his prison term, he again began to deal with Williamson. No longer engaged in switching numbers, Moss rebuilt cars from supposedly salvaged and wrecked vehicles. According to Williamson, Williamson would steal a car, cut it up and remove the numbers at his place of operation in Pittsburgh, Pennsylvania. He would then send the parts, in separate shipments in order to avoid identification of them as coming from the same auto, to Moss in Danville, Virginia.
 
 
 5
 Three of Moss' employees testified that they were suspicious of the parts arriving from Williamson's business in Pittsburgh and brought their suspicions to Moss's attention. Moss told the employees that he always got a receipt and paid for the clips by check.
 
 
 6
 According to Williamson, Moss received hundreds of clips from him from May 1986 until June 1988, when the arrests were made. Moss placed orders with Williamson by phone for specific parts. Some of the conversations with Williamson were taped by the Pittsburgh police who were investigating Williamson. Williamson was arrested in September 1987 on local drug and auto theft charges. Thereafter one of Williamson's associates, Richard Merlo, took over the business of delivering clips to Moss. Merlo testified that Moss did not know that the clips were stolen.
 
 
 7
 The incident leading up to the arrest began on June 21, 1988, when a volunteer fireman happened upon the Pittsburgh "chop shop" while selling raffle tickets. The fireman alerted police and reported that he had observed a rental truck on the property. The police, recognizing Williamson's handiwork, alerted the Danville, Virginia, FBI to look for a delivery of stolen auto parts.
 
 
 8
 Two days later, the FBI found the stolen Pittsburgh vehicles. One clip was at Moss' main business and the other at Charles' Auto, where Charles Clark rebuilt Hondas for Moss. While seizing the clips from Charles' Auto, the FBI agent noticed two other clips that looked to be in good condition and hence possibly stolen. The agent photographed those two clips, but did not seize them. Later that night and in a rainstorm, Moss removed the clips from Charles' Auto. He lied to both Clark and to the FBI about the disappearance of the clips.
 
 
 9
 During trial Moss denied that he knew that the parts he was ordering and buying from Williamson were stolen. An auto parts dealer testified that it was not uncommon to buy auto parts without numbers.
 
 
 10
 On March 17, 1989, Moss and his corporation, Crown Auto, Inc., were indicted for conspiracy to engage in interstate transportation of stolen automobile parts and with two substantive counts of transportation and receipt of stolen goods on June 21, 1988. The date of the earliest overt act was listed as the date of the Brandywine incident. After trial on September 21-26, 1989, Moss was convicted on all counts. At the sentencing hearing on December 21, 1989, Moss was sentenced to 51 months of incarceration to be followed by two years of supervised release as well as to pay a $15,000 fine.
 
 
 11
 In arriving at the sentence the district judge found the loss from the thefts to be in excess of $500,000. He granted enhancements for obstruction of justice and for Moss' role as a leader or organizer of the organization. The district judge also gave a two-point reduction for acceptance of responsibility, a finding not challenged by the government.
 
 II.
 A. Sufficiency of the evidence
 
 12
 In reviewing the sufficiency of the evidence on appeal, the evidence must be viewed in the light most favorable to the government. Glasser v. United States, 315 U.S. 60, 80 (1942). Moss' chief complaint is that there was no direct evidence that he knew that the parts that he was ordering and receiving were stolen. Indeed, Moss' testimony and that of some of his witnesses would indicate that he did not know. Nevertheless, the jury clearly did not believe that testimony.
 
 
 13
 The evidence did establish that Moss knew that the parts had no serial numbers on them and that their condition was excellent, in contradiction to what one would expect from a "totaled" car sold as salvage. Several of Moss' own employees brought their suspicions to his attention. Testimony also established that Moss knew that front and rear clips seemed to match; that "Willie" had no office number, but could be reached at home and had previously, in the Brandywine incident, sold Moss a stolen front end which the government had seized.
 
 
 14
 On cross-examination, Moss admitted to being involved in a similar crime previously, and additionally admitted that he had lied to the FBI in its investigation of the case, and had removed evidence from a location known to the FBI. Clearly, the jury did not believe Moss' assertions about what he did and did not know. As rational triers of fact, the jurors could find the essential elements of the crime beyond a reasonable doubt.
 
 
 15
 B. Admission of the evidence of the Brandywine incident
 
 
 16
 Moss now argues that it was error for the court to admit the evidence of the Brandywine incident without requiring the government to explain its purpose in introducing it or to articulate the requisite balancing under Fed.R.Evid. 403 to show that the probative value of the evidence outweighed its prejudicial impact. The court, however, did not need to enunciate its computation of the relevance vs. prejudice equation where the appropriateness of admission is reflected in the record as a whole. United States v. Lewis, 780 F.2d 1140, 1142 (4th Cir.1986).
 
 
 17
 Next Moss attacks the evidence under Fed.R.Evid. 404(b), the rule under which, though not articulated, it was manifestly admitted. Fed.R.Evid. 404(b) provides that evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person but is admissible as proof of "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." A district court's decision regarding the admissibility of evidence under that Rule is reviewed for an abuse of discretion. United States v. Ramey, 791 F.2d 317, 323 (4th Cir.1986).
 
 
 18
 Moss never contested the business relationship he had with Williamson, only denying that he knew or had reason to know that the parts he was receiving were stolen. Consequently, he charges error in admitting the incident as proof of a business relationship.
 
 
 19
 Moss' contention may be well-taken if the incident was only admitted to prove a business relationship. The incident obviously goes further, however, to demonstrate what Moss knew, should have known, or consciously avoided knowing. The Prince George's County trooper who seized the part, Elmer J. McKey, Jr., testified that he never told Moss that the part was stolen, but he was permitted to testify, over objection as hearsay, that the part was stolen. Obviously, that information prejudiced Moss. Equally obvious is the fact that the incident rebutted Moss' claim of no knowledge of Williamson's status as a thief and tends to show Moss' knowledge of the conspiracy. The district court did not abuse its discretion in admitting it. United States v. Watford, 894 F.2d 665, 671 (4th Cir.1990) (evidence of prior bad acts properly admitted to show knowledge of plan or scheme).
 
 C. The "wilful blindness" jury instruction
 
 20
 The "wilful blindness" jury instruction was requested by the government and read to the jury as follows:
 
 
 21
 The element of knowledge may be satisfied by inferences drawn from proof that a defendant deliberately closed his eyes to what would otherwise have been obvious to him. A finding beyond reasonable doubt of a conscious purpose to avoid enlightenment would permit an inference of knowledge. Stated another way, a defendant's knowledge of a fact may be inferred from wilful blindness to the existence of the fact.
 
 
 22
 It is entirely up to you, as to whether you find any deliberate closing of the eyes, and the inferences to be drawn from any such evidence. A showing of negligence or mistake is not sufficient to support a finding of wilfulness or knowledge.
 
 
 23
 The government correctly notes that the word "may" throughout the instruction, as well as the instruction that any inference of knowledge was "entirely up to" the jury, precludes any challenge to the instruction as mandating that the jury find certain things to be true. See United States v. Picciandra, 788 F.2d 39, 46 (1st Cir.1986) (instruction appropriate when defendant claims a lack of knowledge, facts suggest otherwise, and instruction taken as a whole cannot be misunderstood as mandating that a juror infer actual knowledge).
 
 
 24
 Moss introduced evidence to indicate his unintentional lack of knowledge. He attacked Williamson's credibility as well as presented the testimony of Williamson's partner, Merlo, who testified that Moss did not know that the parts were stolen and that he [Merlo] and Williamson dumped parts on Moss because Moss had a large demand for them. Moss, by arguing that giving the instruction was error, is attacking as unsupported the jury's decision to disbelieve his evidence showing his unintentional lack of knowledge. Viewing the evidence in the light most favorable to the government, Glasser, supra, the verdict can stand.
 
 III. Sentencing Issues
 A. Calculation of loss
 
 25
 Moss has argued that there was an insufficient factual basis for the court's calculation that Moss was responsible for an automobile theft loss in excess of $500,000. He argues that the loss should only be that of the stolen vehicles that were physically recovered on June 23, 1988, and that once he disputed the theft loss figure in the presentence report, the court was bound to address the issue pursuant to Fed.R.Crim.P. 32(c)(3)(D).[2]
 
 
 26
 The government's proof of loss was based on the receipts which showed $155,000 worth of parts received by Moss from Williamson. Williamson had testified that all those parts were stolen, a fact corroborated by Jed Dexcalzi, one of Williamson's employees. An FBI agent knowledgeable about the entire scheme, Charles Mauer, estimated the approximate value of the stolen vehicles as between $700,000 and $1,500,000. The probation officer in charge of the presentence report based his calculations on an examination of the receipts and a mathematical determination of a ratio between the value of parts compared to the value of the entire stolen vehicle. His estimate was $777,100.
 
 
 27
 The district judge acknowledged that there was a dispute as to loss value and reserved ruling on that issue until after evidence was heard. He then resolved Williamson's credibility issues against Moss, as the jury had also done. He also resolved doubts about the aggregate value in Moss' favor by accepting the lower estimate of $700,000. These findings comply with Fed.R.Crim.P. 32.
 
 
 28
 The government's burden of proof for sentencing factors is a preponderance of the evidence. United States v. Urrego Linares, 879 F.2d 1234, 1237-38 (4th Cir.), cert. denied, --- U.S. ----, 110 S.Ct. 346 (1989). The Court must review for clear error. United States v. Wilson, 900 F.2d 1350, 1355 (9th Cir.1990). The Guidelines, in the commentary to Sec. 2B1.1, state: "The loss need not be determined with precision, and may be inferred from any reasonably reliable information available, including the scope of the operation."
 
 
 29
 Moss' contention that the district court sentenced him using "misinformation of a constitutional magnitude" is not persuasive. Once again, it is another attack upon the fact finder's acceptance of both Williamson's and the FBI agent's testimony. Though Moss argues that the court erred in giving "unwarranted weight to inaccurate information," the determination of the accuracy of the information was the province of the fact finder.
 
 
 30
 B. Enhancement of Moss' sentence for obstruction of justice
 
 
 31
 Section 3C1.1 of the Guidelines provides for a sentence enhancement of two points "[i]f the defendant willfully impeded or obstructed or attempted to impede or obstruct the administration of justice during the investigation or prosecution of the instant offense...." The appellate standard of review is whether a district court's decision to add points to the offense level for obstruction of justice was clearly erroneous. United States v. Franco-Torres, 869 F.2d 797, 800 (5th Cir.1989).
 
 
 32
 Moss has admitted lying to the FBI about the two Honda Prelude clips that were dropped off for him at Charles' Auto. When asked about the clips, Moss lied and told the agent that he knew nothing about them and had not ordered them. Moss then removed the clips late at night, after the FBI had photographed them. He has contended that, because the FBI did not seize the clips then or when they again relocated them after the removal, his lie was not material to the investigation. The contention is without merit. The government's decision not to seize the clips does not change the fact that Moss was impeding the investigation by lying to the FBI about the clips. The district judge's enhancement for obstruction of justice cannot be called clearly erroneous.
 
 C. Enhancement as a leader or organizer
 
 33
 The determination of a defendant as a leader or organizer of an operation is again a factual one which is reviewed under the clearly erroneous standard. United States v. Sheffer, 896 F.2d 842, 846 (4th Cir.1990).
 
 
 34
 The finding that a defendant is a leader or organizer increases the sentence by four levels. The Commentary to Guideline Sec. 3B1.1(a) lists the factors to be considered in assessing such a role. Those factors include the exercise of decision-making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the nature and scope of the illegal activity and the degree of control and authority exercised over others.
 
 
 35
 Charles Mauer, the FBI agent in Pittsburgh, testified about the scope of business conducted between Williamson and Moss and that Moss was Williamson's major customer. Moss purchased clips from Williamson at the rate of two to three cars a week. Three other people would then transport the stolen parts from Pittsburgh to Moss. Mauer testified that Williamson had standing authority from Moss to purchase legitimate salvage vehicles. Williamson would then steal identical vehicles to cut and match so as to allow Moss to sell the completed vehicle as a legitimately rebuilt car. Mauer testified that information obtained from wiretaps and PIN registers demonstrated that Moss would order parts by color, kind, make and model. The FBI also knew that Moss and Williamson were in constant contact, and that the operation required considerable planning and organization to operate.
 
 
 36
 Based upon Mauer's testimony and the inferences drawn from it, there was sufficient evidence to show that Moss was a leader or organizer of the operation. The finding that he was is not clearly erroneous.
 
 Accordingly, the judgment is
 
 37
 AFFIRMED.
 
 
 
 [1]
 A clip is either the front or rear end of an automobile
 
 
 [2]
 Fed.R.Crim P. 32(c)(3)(D) states:
 If the comments of the defendant and the defendant's counsel or testimony or other information introduced by them allege any factual inaccuracy in the presentence investigation report or the summary of the report or part thereof, the court shall, as to each matter controverted, make (i) a finding as to the allegation, or (ii) a determination that no such finding is necessary because the matter controverted will not be taken into account in sentencing. A written record of such findings and determinations shall be appended to and accompany any copy of the presentence investigation report thereafter made available to the Bureau of Prisons.