995 F.2d 233
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
Harvey Wes DANIELS, Defendant-Appellant.
 No. 92-50246.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Jan. 8, 1993.
Decided June 10, 1993.
 
 1
 Before: CANBY and NORRIS, Circuit Judges, and TANNER** District Judge.
 
 
 2
 MEMORANDUM***
 
 
 3
 Harvey Daniels appeals his sentence following jury convictions on counts of conspiring to sell stolen bonds, in violation of 18 U.S.C. § 371; aiding and abetting in the distribution of stolen bonds, in violation of 18 U.S.C. § 2315; and possessing counterfeit money, in violation of 18 U.S.C. § 474. For the most part we reject Daniels' challenge to the district court's valuation of loss under U.S.S.G. section 2B1.1. However, we agree with Daniels that he was not an organizer or leader within the meaning of U.S.S.G. section 3B1.1. We vacate the sentence and remand for resentencing.
 
 
 4
 * Daniels conspired with others to sell 48 bonds that had been stolen from a shipment of 1500 bonds destined for sale in Europe. The securities were bearer bonds, and were not registered with the IRS. Each bond had a face value of 10,000 Canadian dollars and contained five dated interest coupons. One coupon matured each year at a fixed rate of 11 7/8%
 
 
 5
 The bonds were probably unmarketable, and their interest coupons unredeemable, because the issuer had never authenticated them. The issuer also stopped payment on the bonds contained in the missing shipment. The entire shipment, including the stolen box, was insured for $2000 to cover reprinting costs.
 
 
 6
 Daniels and his co-conspirators tried to sell to undercover agents the 48 bonds they held. Although Daniels neither stole the bonds nor delivered them to the agents, he participated in negotiations for their sale. Following delivery, it was Daniels who arranged to receive payment from an undercover informant.
 
 
 7
 Daniels brought his brother and another man with him when he met the informant at a restaurant. Daniels and one of his companions each carried a concealed, loaded gun. Daniels talked with the informant inside the restaurant while the two companions waited outside and watched the parking lot.
 
 
 8
 The three men were arrested after Daniels received $90,000 from the informant. The lookouts later told police that Daniels had hired them to provide security and counter-surveillance at the meeting. They denied knowing anything, however, about stolen bonds. Their statements were not introduced at Daniels' trial, nor did the government present evidence showing that the two lookouts knew why Daniels met the informant.
 
 
 9
 At sentencing, the district court calculated loss on the basis of the bonds' face value. Discounting at a stipulated rate of 80 American cents to each Canadian dollar, the face value of the 48 bonds was approximately $380,000. Daniels maintained that the loss was at most $90,000. The larger figure placed Daniels' offense level three steps higher than did Daniels' calculation.
 
 
 10
 The district court added to its figure, over Daniels' objection, the future value of the bond's interest coupons. That value was approximately $228,000. Adding interest to the loss figure added one step to Daniels' offense level.
 
 
 11
 Although the government had not recommended it, Daniels also received a two-step increase under section 3B1.1(c). The district court found that the two lookouts knew criminal activity was afoot at the restaurant meeting. That knowledge, the court determined, was sufficient evidence of their criminal responsibility to hold Daniels accountable as an organizer or leader.
 
 
 12
 After further adjustments not relevant to this appeal, the offense level was fixed at 20. The sentencing range at that level, in light of Daniels' criminal history, was 41-51 months imprisonment. The district court sentenced Daniels to 48 months.
 
 II
 
 13
 This court reviews de novo the district court's interpretation of the Guidelines. However, we examine for clear error the district court's factual findings, giving due deference to the court's application of the Guidelines to the facts. United States v. Joetski, 952 F.2d 1090, 1096 (9th Cir.1991).
 
 
 14
 U.S.S.G. section 2B1.1, which establishes offense levels for larceny, embezzlement, and other theft, governs this case. Commentary to that guideline provides in part:
 
 
 15
 "Loss" means the value of the property taken, damaged, or destroyed. Ordinarily, when property is taken or destroyed the loss is the fair market value of the particular property at issue. Where the market value is difficult to ascertain or inadequate to measure harm to the victim, the court may measure loss in some other way, such as reasonable replacement cost to the victim.
 
 
 16
 Section 2B1.1, comment (n. 2).
 
 
 17
 Daniels contends initially that any loss is small because his conduct victimized no one. That argument is meritless. Daniels and his co-conspirators tried to sell stolen bonds. It is irrelevant that their buyer was an undercover agent. Cf. United States v. Van Boom, 961 F.2d 145, 147 (9th Cir.1992) (robber arrested before taking money sentenced on the basis of amount he demanded of bank). Nor does it matter that the issuer of the bonds virtually ensured that they were non-negotiable by stopping payment on them. See Joetski, 952 F.2d at 1096-97 (check amount is intended loss even though bank refused to honor it).[1]
 
 
 18
 In the alternative, Daniels argues that $90,000 is the loss because that figure is the fair market value of the bonds. There are two problems with Daniels' characterization. The government maintains that $90,000 was only a partial payment, and the district court made no finding on the issue. Even assuming that $90,000 was the total negotiated price, however, the district court was under no obligation to adopt that figure.
 
 
 19
 "The Ninth Circuit has refused to require a strict market value approach in determining the value of stolen goods." United States v. Wilson, 900 F.2d 1350, 1356 (9th Cir.1990). Here, as in Wilson, a figure suggests the value of stolen property in a thieves' market, but there is no easy way to determine a similar figure for that property in an open market. Furthermore, there is no guarantee that the two figures would be equivalent. See id. "Where goods have no readily ascertainable market value," we said in Wilson, "any reasonable method may be employed to ascribe an equivalent monetary value to the items." Id.
 
 
 20
 Because an open market and a black market often yield different figures for stolen goods, neither United States v. Luckey, 655 F.2d 203 (9th Cir.1981), nor United States v. Wallace, 800 F.2d 1509 (9th Cir.1986), cert. denied, 481 U.S. 1019 (1987), control sentencing for federal crimes involving stolen property. Those pre-guideline cases decided only whether blank checks and unissued airline tickets had the requisite value necessary to meet the $5000 jurisdictional minimum.
 
 
 21
 Difficulty in measurement is not the only justification for fashioning an alternative measure of loss. Wilson and subsequent decisions recognize that section 2B1.1 addresses both a defendant's gain and a victim's loss. See Wilson, 900 F.2d at 1356; United States v. Pemberton, 904 F.2d 515, 517 (9th Cir.1990). Expert testimony adduced at trial shows that even if a bank would not have bought one of the stolen bonds, it might have accepted the bond as collateral for a loan. The risk of harm to potential buyers and lenders was far from speculative; furthermore, Daniels intentionally created the risk. Under those circumstances, the district court was entitled to search for a measure of loss that would quantify those risks.
 
 
 22
 The face value of the bonds provided a reasonable quantification of the risk to unsuspecting buyers or lenders. In a similar case involving stolen stock certificates, the Eleventh Circuit ruled that the face value of the certificates could be used to compute the loss. United States v. Jenkins, 901 F.2d 1075, 1084 (11th Cir.), cert. denied, 111 S.Ct. 259 (1990). Although the owners of the certificates in Jenkins had been identified, the rationale of that case is persuasive here. Whether a buyer for these bonds actually existed is irrelevant under the Guidelines. See United States v. Resurrection, 978 F.2d 759, 762-63 (1st Cir.1992) (risk of harm that a defendant intentionally creates is relevant conduct under the Guidelines). Moreover, the government had no duty to show that a potential buyer probably would have paid face value for the bonds. See United States v. Koenig, 952 F.2d 267, 271 (9th Cir.1991).
 
 
 23
 Related Ninth Circuit authority supports application of the Jenkins approach in this case. In United States v. Pemberton, 904 F.2d 515, 517 (9th Cir.1990), we relied on the contract price of stolen architectural drawings that were worthless to anyone but the commissioner of the drawings and the architect who drew them. The defendant's potential gain was negligible, but the harm to the victims was great. This case presents a similar situation.
 
 
 24
 Thus, the district court acted within its discretion in calculating the loss according to the face value of the bonds. The parties now agree, however, that it was error to add the future value of the interest coupons because no buyer would have paid for that benefit. Rather, the court should have calculated a premium for the bonds on the basis of the difference between the 11 7/8% yield these bonds carried and a prevailing interest rate on other investments. We remand for that computation.[2]
 
 III
 
 25
 The second question presented is whether Daniels acted as an organizer or leader within the meaning of section 3B1.1(c). That section applies only when an offense is committed by more than one person who is criminally responsible for the commission of the offense. United States v. Anderson, 942 F.2d 606, 617 (9th Cir.1991) (en banc). Because the relevant facts are undisputed, we review de novo the district court's legal determination that Daniels' two lookouts were criminally responsible. See id. at 609.
 
 
 26
 The district court reasoned that Anderson required less than a showing that alleged participants had the intent to commit a substantive crime. The court stated:
 
 
 27
 As I remember the evidence, [Daniels] came [to the restaurant] for purposes of conducting criminal activity. He brought a couple of guys with him who were armed. They were there to watch, to give him protection. They were there at his instigation. I don't think ... they have to know the exact nature of the criminal activity in order to be supervisees. I think that it was enough that they were aware the criminal activity was afoot and that they were participating in it.
 
 
 28
 "[A]ll that Anderson stands for," the court said, "is [that] manipulating somebody who was innocent into helping you with a crime doesn't make you a supervisor."
 
 
 29
 We disagree with the district court's conclusion that these lookouts were criminally responsible supervisees. There is nothing in the record that would support a finding that either lookout could have been convicted of the substantive offense. We have sustained the conspiracy convictions of defendants who provided surveillance to a ringleader at the moment an illegal transaction occurred. See, e.g., United States v. Mares, 940 F.2d 455, 459 (9th Cir.1991). Here, however, there was no evidence that either man knew that Daniels was selling stolen bonds or counterfeit money, no inference therefore arises that they intended to aid that conspiracy. See United States v. Medina, 940 F.2d 1247, 1250 (9th Cir.1991). Similarly, that lack of knowledge destroys their potential liability on an aiding and abetting theory. See United States v. Vasquez-Chan, 978 F.2d 546, 552 (9th Cir.1992) (an aider and abettor must have "intentionally assisted in the venture's illegal purpose") (citations omitted). Finally, there was no evidence that either lookout "deliberately avoided learning the truth" about the purpose of the meeting between Daniels and the informant. See United States v. Jewell, 532 F.2d 697 (9th Cir.), cert. denied, 426 U.S. 951 (1976). A trier of fact could not have inferred that the lookouts knew that purpose without evidence of their deliberate ignorance. United States v. Chu, No. 92-50295, slip op. 2337, 2344 (9th Cir. Mar. 16, 1993).
 
 
 30
 Because on this record the two lookouts could not have been convicted of any crime, they were not criminally responsible under Anderson. As a result, the district court erred when it found that Daniels was an organizer or leader within the meaning of section 3B1.1(c).
 
 
 31
 VACATED AND REMANDED FOR RESENTENCING.
 
 
 
 *
 Honorable Alex Kozinski, Circuit Judge, sitting by designation
 
 
 **
 Honorable Jack E. Tanner, Senior United States District Judge for the Western District of Washington, sitting by designation
 
 
 ***
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Cir.R. 36-3
 
 
 [1]
 Joetski applied U.S.S.G. section 2F1.1, addressing fraud and deceit crimes, rather than section 2B1.1. That distinction is unimportant here. The commentary to section 2F1.1 directs courts to assess loss under that section in the same manner as in cases involving section 2B1.1. See section 2F1.1, comment. (n. 7)
 
 
 [2]
 Daniels suggests that a sentence imposed on the basis of the face value and interest due on the bonds violates due process, citing United States v. Walton, 908 F.2d 1289 (6th Cir.), cert. denied, 111 S.Ct. 532 (1990). Walton held merely that a court lacks authority to hold a defendant responsible for a specific quantity of drugs unless the court can determine that the defendant is more likely than not actually responsible for an amount greater than or equal to the specified quantity. See id. at 1302. That case is irrelevant here, for there is no dispute concerning the number of bonds that Daniels tried to sell. Moreover, the loss computation was not an arbitrary figure, but one taken from the face of the bonds themselves