**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Ronald GOLDBERG, Defendant–Appellant.**

**No. 93–4007.**

United States Court of Appeals, Eleventh Circuit.

Aug. 16, 1995.

---

William M. Norris, Law Offices of Norris & Mann, P.A., Coral Gables, FL, for appellant.

Carol Herman, Linda Collins Hertz, Kathy A. Stark, Asst. U.S. Attys., Miami, FL, for appellee.

Before COX, Circuit Judge, HILL and GARZA *, Senior Circuit Judges.

HILL, Senior Circuit Judge:

In this appeal we discuss two sentencing issues: (1) whether the district court correctly applied the United States Sentencing Guidelines (Guidelines or USSG) § 2F1.1, concerning fraud, to both fraud and property theft counts in calculating Appellant Ronald J. Goldberg's base offense level, and, (2) whether the district court correctly calculated the amount of the loss for sentencing purposes.[1] While we affirm the district court's application of the Guidelines to both the fraud and the property theft counts, we find that it erred in its method of calculating loss. Therefore we vacate Goldberg's sentence and remand for resentencing consistent with this opinion.

## I. BACKGROUND

In August 1990, General Motors Acceptance Corporation (GMAC) placed an order with American Bank Note Corporation of Philadelphia to print a series of bearer bonds

* Honorable Reynaldo G. Garza, Senior U.S. Circuit Judge for the Fifth Circuit, sitting by designation.

1. A third sentencing issue raised by Goldberg, i.e., whether the district court erred in applying the four-level enhancement under USSG § 3B1.1(a) for his leadership role in a multi-participant criminal activity, is without merit and affirmed without discussion.

in $1,000 and $10,000 (Canadian dollar) denominations and ship them to the Chemical Bank of London. Two months later, the bonds were ready for overseas transfer via British Airways. Physically, the printed bonds filled thirty-one cardboard containers.[2] However, somewhere between the printer's loading dock and the airport, one carton, containing 1,500 bonds, was stolen. When GMAC learned of the theft, the missing bonds were reported to the FBI, cancelled, and replaced by new bonds with different serial numbers. At the time of the theft, Goldberg was incarcerated. However, after his release, certain of the stolen bonds were found in his actual or constructive possession. An indictment was returned in April 1991. Goldberg was tried and convicted on seven counts of possession and interstate transportation of stolen securities, bank fraud, and attempted escape.[3]

In the Presentence Investigation Report (PSR), the probation officer credited Goldberg with 790 bonds (in $10,000 denominations), valuing them for loss purposes at $7,900,000. In his sentencing memorandum, Goldberg objected to the probation officer's

calculation of loss and proffered a list of expert witnesses who would testify at an evidentiary hearing that the stolen, unissued, unauthenticated GMAC bonds, while potentially of value in a black market, were actually worthless pieces of paper.[4] For the most part the district court adopted the PSR and declined to hold an evidentiary hearing.

At sentencing, the district court determined as a matter of law that Counts I through VI (the fraud and the property theft counts) should be grouped together for sentencing purposes under USSG § 3D1.2(d).[5] Using USSG § 2F1.1(a), it determined Goldberg's base offense level to be six. Making oral findings of fact that the value of the loss exceeded $5,000,000, the court then added fourteen specific offense levels under USSG § 2F1.1(b)(1)(O).[6] After further adjustments not relevant to this appeal, the adjusted offense level was fixed at twenty-six.

## II. STANDARD OF REVIEW

■■■ The district court's interpretation of the Guidelines is a question of law which

---

2. The total order was for 37,700 bonds in $1,000 denominations and 8,950 bonds in $10,000 denominations.

3. Juries in two separate trials found Goldberg guilty of interstate transportation of stolen securities, in violation of 18 U.S.C. §§ 2314 and 2 (Count I); possession of stolen securities, in violation of 18 U.S.C. §§ 2315 and 2 (Count II); devising a scheme to defraud a federally insured financial institution, in violation of 18 U.S.C. §§ 1344 and 2 (Counts III, IV, and V); making false statements of material fact on an application for a loan from a federally insured institution, in violation of 18 U.S.C. §§ 1014 and 2 (Count VI); and attempted escape from the Metropolitan Correctional Center, in violation of 18 U.S.C. § 751(a) (Count VII). The district court sentenced Goldberg to 120 months' imprisonment on the securities counts, 150 months' imprisonment on the bank fraud counts, and sixty months' imprisonment on the attempted escape count, all to run concurrently.

4. Goldberg concedes the PSR's calculation of fraud loss in the amount of $2,115.00.

5. USSG § 3D1.2 states:
   All counts involving substantially the same harm shall be grouped together into a single

Group. Counts involve substantially the same harm within the meaning of this rule:

    *    *    *    *    *    *

(d) When the offense level is determined largely on the basis of the total amount of harm or loss, the quantity of a substance involved, or some other measure of aggregate harm, or if the offense behavior is ongoing or continuous in nature and the offense guideline is written to cover such behavior.
Offenses covered by the following guidelines are to be grouped under this subsection:
    §§ 2B1.1, 2B1.2 ...
    §§ 2F1.1, 2F1.2....

6. Implicit in the sentencing transcript, the district court appears to use a quasi-face value method of calculating loss:

   It is the judgement [sic] of the Court that under the factual basis in this case, as to the value that the defendant intended to place into commerce, the value of the loss in his mind would have acceded [sic] $5,000,000; notwithstanding the present value.

we review under a *de novo* standard. *United States v. Gonzalez,* 2 F.3d 369, 371 (11th Cir.1993). We use the same *de novo* standard to scrutinize a district court's choice of the appropriate sentencing guideline to apply to a given set of facts. *United States v. Shriver,* 967 F.2d 572, 574 (11th Cir.1992). However, a district court's calculation of the amount of the loss is a factual determination reviewed for clear error. *United States v. Menichino,* 989 F.2d 438, 440 (11th Cir.1993).

## III. DISCUSSION

### A. *Grouping of Offenses* [7]

■ Goldberg contends that the district court erred in calculating his base offense level when it applied a single guideline to both his property theft convictions and his fraud convictions, resulting in an improper loss valuation for sentencing purposes.[8] Goldberg argues that the district court should have made a two-part calculation, using USSG § 2B1.2 for Counts I and II and USSG § 2F1.1 for Counts III through VI. Using this rationale, Goldberg calculates property theft loss at zero and fraud loss at $2,115.00.

The Government argues that Goldberg misapprehends the guideline scheme provid-ing for the grouping of offenses. USSG § 3D1.2(d). We agree.

In Goldberg's six-count indictment, there are both fraud and property theft-oriented charges. The Guidelines require that the district court group together all counts involving "substantially the same harm." USSG § 3D1.2. As the counts here involve offenses of the same general type that involve substantially the same harm, they must be grouped together. USSG § 3D1.2(d). Once grouped together, the court must apply the offense guideline (theft or fraud) that produces the highest offense level. USSG § 3D1.3(b); *see also* USSG § 3D1.3, comment. (n. 3). In addition, the Guidelines direct courts to assess loss for valuation purposes under the fraud section in the same manner as in cases involving property theft. *See* USSG § 2F1.1, comment. (n. 7). In this case the court chose USSG § 2F1.1.[9] Under a *de novo* review, we find that the district court was correct.

### B. *Calculating the Amount of Loss*

Goldberg claims that at sentencing the district court rebuffed his request for an evidentiary hearing on the number of bonds attributable to him and their value.[10] He contends that, as a result of this error, the district

---

7. Procedurally, the Government claims that Goldberg abandoned his grouping objection at sentencing, and, in the absence of plain error, waived appellate consideration of the issue. Goldberg contends that his sentencing argument was predicated on the court's legal conclusion that the counts should be grouped, and that he merely continued under that premise, without conceding the issue. The record transcript supports Goldberg's argument: "By the Court: [t]hat's what I ruled. That's when they agreed." We find the issue preserved for review.

8. At sentencing, the following colloquy occurred: Mr. Norris [counsel for Goldberg]: ... I will tell the Court that since the time I prepared the written materials, I have come to understand in my own mind a little more the reason why the probation officer choose [sic] to proceed under 2F for all of them ... And if you take that as the point of beginning; in other words, you say the probation officer is correct in saying that they should be grouped in one group— The Court: Maybe I can help you. It's my legal opinion that counts one through six should be grouped.

Mr. Norris [Goldberg's counsel]: That is a totally supportable position, and I think I am closer to that [position] than when I wrote this admission [sic] to the Court. With that conclusion, they are properly grouped and that one number should and [sic] be applied to all of them, you start with base offense level of six ...

9. It is interesting to note that, under a face value calculation of loss (discussed at B.), the district court could have chosen USSG § 2F1.1 *or* USSG § 2B1.2 in this case, as either guideline would given Goldberg the same score. Similarly, the same score results under Goldberg's two-part calculation theory.

10. In its brief, the Government asserts that Goldberg does not challenge the total number of bonds with which he was credited. This assertion is not supported by the record.

court incorrectly used an "unsubstantiated number of bonds," multiplied this by "an artificial value," *i.e.*, the quasi-face value of the stolen bonds, and prejudicially portrayed him as "the eight million dollar man."

Goldberg contends that the stolen bonds were actually worthless on their face, something that any unsuspecting buyer or lender could have verified "with a single telephone call" and that "[n]o one in this case ever realized a penny from the bonds." In the alternative, he argues that his expert witnesses would establish, at the very best, only a discounted black market value for the unexecuted bonds as they were not "turned on."

■ This argument is without foundation in this circuit. For sentencing purposes, the face value of the bonds provides a reasonable quantification of the risk to unsuspecting buyers or lenders. *See United States v. Jenkins,* 901 F.2d 1075, 1084 (11th Cir.), *cert. denied,* 498 U.S. 901, 111 S.Ct. 259, 112 L.Ed.2d 216 (1990).[11]

*Jenkins* pertained to the sentencing of a bank security guard for bank larceny involving stolen stock certificates. Jenkins claimed the sentencing court erred in calculating his sentence based on the face value of the stolen stock certificates. *Id.* at 1083. He argued that while the face value of the stolen securities totalled $101,741.64, the securities were non-negotiable and thus the face value did not equal the actual value lost. *Id.* Jenkins claimed that the replacement value of the stock—the cost of reprinting the stock certificates—was only $1,017; hence the court should have computed his sentence using the

$1,017 replacement value of the stock rather than the $101,741.64 face value of the stock. *Id.* at 1084. The Government argued that Jenkins' sentence should be calculated based on the face value of the stocks as that amount represented the value of the property stolen. *Id.*

The court found at 1084 that:

We agree with the [G]overnment's argument. It is true that Jenkins would not have been able to obtain the face value of non-negotiable stocks or bonds; to him they would have been worthless. To those from whom they were stolen, however, the face value on the stocks determined how much interest they would receive and the value of their stock at the time of maturity. The fact that the stolen stock certificates may be cancelled and new certificates may be issued in their place does not change the value of the items stolen for sentencing purposes any more than recovery of a stolen car changes its value for sentencing purposes. Jenkins took from his victims securities that were worth $101,741.64 to those victims in some way and at some time. The district court correctly computed his sentence based on this amount.

We are bound by *Jenkins.*[12] Interestingly enough, the *Jenkins* case was cited and the *Jenkins* approach was used by the Ninth Circuit in a case *involving the very same sentencing issue as it related to the very same GMAC bonds stolen from the very same shipment as we have in the case before us. United States v. Daniels,* 1993 WL 205860, 1993 U.S.App. LEXIS 14776 (9th Cir.1993).[13] We note that *Daniels* is a nonpublished opinion that, under Ninth Circuit

---

11. *Jenkins* applied USSG § 2B1.1, addressing property theft crimes, rather than USSG § 2F1.1, addressing fraud and deceit crimes. That distinction is unimportant here. *See* USSG § 2F1.1, comment. (n. 7).

12. *See also United States v. Pemberton,* 904 F.2d 515, 517 (9th Cir.1990) (where the court relied on the contract price of stolen architectural drawings that were worthless to anyone but the commissioner of the drawings and the architect who drew them, reasoning that the defendant's potential gain was negligible, but the harm to the victims was great).

13. We may have discovered in *Daniels* the long-sought "white horse case." It is said that a rural, small town, provincial judge once heard a case brought by a big city business against a local farmer. The case involved the sale of a horse. Though the facts seemed strongly against the local defendant, the judge sought a legal premise upon which to rule in his favor. The plaintiff's big city lawyer produced a case from that state's supreme court apparently on "all fours." The judge studied the case with great care, then handed the volume back to counsel, observing: "That case involved the sale of a

rules, cannot be cited to or regarded as precedent in that Circuit [USCS Ct.App. 9th Cir.R. 36–3 (1994) ], but we find that it correctly interprets Eleventh Circuit precedent which *is* binding on us.[14]

For these reasons we find that the district court clearly erred in its method of calculating loss under *Jenkins,* as interpreted by *Daniels.* We remand for resentencing, after an evidentiary hearing on the actual number of bonds for which Goldberg is being held responsible, and, on the face value of the bonds, with proper consideration given to the appropriate discount rate to impose on an exchange of American dollars for Canadian dollars in the time frame relevant to this case. As a practical matter, we realize that at the end of this road Goldberg may very well end up in the same place from whence he began, that is, above the $5,000,000 level under USSG § 2F1.1(b)(1)(*O*), with a specific offense level enhancement of fourteen levels, but it was error not to proceed in this manner in the first instance.

### IV. CONCLUSION

We affirm Goldberg's convictions. However, for the reasons discussed, we vacate his sentence and remand for resentencing consistent with this opinion.

AFFIRMED in part; VACATED in part, and REMANDED for RESENTENCING.

black horse. It does not apply here, for we are trying a case involving a white horse. Now, if you could bring me a white horse case, that would be some authority in your favor."

14. The district court in *Daniels* calculated loss for sentencing purposes on the basis of the face value of the GMAC bonds and discounted it at a stipulated rate of 80 American cents to each Canadian dollar. The court then added to this figure the future value of the bonds' interest coupons. The Ninth Circuit found that, while the district court acted within its discretion in calculating the loss according to the face value of the bonds, it was error to add the future value of the interest coupons as no buyer would have paid for that benefit. Instead, the Ninth Circuit found that the district court should have calculated a premium for the bonds on the basis of the difference between the 11⅞% yield that these GMAC bonds carried and a prevailing interest rate on other investments. Insofar as valuation was concerned, it remanded for that computation only.