UNITED STATES of America,
Plaintiff–Appellee,

v.

Pedro HERNANDEZ, Defendant–
Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Jose Mario HERNANDEZ,
Defendant–Appellant.

Nos. 90–50556, 90–50589.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 6, 1991.

Decided Dec. 24, 1991.

David J. Cohen and Phillip C. Nychay, Federal Defenders of San Diego, Inc., San Diego, Cal., for defendant-appellant Jose Hernandez.

Raul A. Sahagun, Sahagun & Danton, Downey, Cal., for defendant-appellant Pedro Hernandez.

Melanie K. Pierson, Asst. U.S. Atty., San Diego, Cal., for plaintiff-appellee.

Before SNEED, BEEZER and TROTT, Circuit Judges.

TROTT, Circuit Judge:

Pedro and Jose Hernandez (respectively, "Pedro" and "Jose") appeal their convictions of four felonies relating to the counterfeiting of audio cassettes and labels. They both claim there was insufficient evidence to convict them, and they both appeal their sentences. Jose makes two additional claims: first, he appeals the district court's refusal to sever his trial from Pedro's; second, he appeals the court's refusal to grant him a mistrial based on a gesture he made to a witness. We have jurisdiction under 28 U.S.C. § 1291 (1988) and 18 U.S.C. § 3742(a) (1988), and we affirm.

**I**

In December of 1989, the Recording Industry Association of America, Inc. ("RIAA")[1] received an anonymous telephone tip that Pedro Hernandez was running an audio cassette counterfeiting ring in southern California. The RIAA transmitted their information to the United States Customs Service, and sent their Western Representative, Ralph Vaughan, to surveil a warehouse at 3802 Main Street in Chula Vista, California. The lease for that warehouse was signed by Pedro Hernandez. Vaughan watched the warehouse "very infrequent[ly]," whenever he was in the San Diego area.

---

1. "The RIAA is a not-for-profit corporation that serves as a trade association representing about 45 (forty-five) sound recording companies which account for about 90 (ninety) per cent of all records and tapes legitimately produced in the United States." Declaration of Ralph Vaughan.

On January 18, 1990, Vaughan knocked on the door of the warehouse. When the door was opened, Vaughan saw inside the warehouse twenty-four cartons with the words "250 count library boxes" printed on the side of each carton. A "library box" is the plastic box in which a cassette tape is packaged.

On February 6, 1990, Vaughan saw Jose Hernandez leave the warehouse through the cargo door, get into a brown van, and back the van up to the cargo door. Vaughan saw Jose load three 250–count–library–box cartons into the van. Vaughan also observed Pedro Hernandez drive up to the warehouse in a silver van. Pedro and Jose had a discussion, and then loaded approximately eighteen more cartons from the warehouse into the brown van.

Vaughan followed as Jose drove the brown van to 2385 Main Street in Chula Vista, a self-storage park. Vaughan observed Pedro drive up in the silver van, and watched the brothers loading the cartons of library boxes into one of the storage units. Some of the cartons were open, and Vaughan saw they contained library boxes with cassette tapes in shrink wrap.

On March 16, 1990, Vaughan saw Jose Hernandez drive up to the warehouse in the brown van, and back up to the cargo door. Jose went into the warehouse and came out with a carton which he put into the van. He repeated this procedure twice more, loading a total of three cartons into the brown van. Jose then entered the warehouse and brought out the trash, which contained broken tape boxes, and five counterfeit J-cards. A J-card is "the piece of paper that wraps up the cassette inside the plastic [library] box. . . . [and] contains the photo of the group performing on the tape and trademark." Cross-examination of U.S. Customs Special Agent Gordon Slavik.

Beginning in December 1989, Special Agent Gordon Slavik also surveilled the warehouse. During his surveillance, Slavik occasionally observed Jose driving the brown van to the warehouse, and Pedro driving the silver van from the warehouse.

On March 21, 1990, Special Agent Slavik obtained search warrants for both the warehouse and the self-storage unit. At the self-storage unit, agents discovered 124 cassette tapes, miscellaneous documents, and several display boxes for cassette tapes.

At the warehouse, agents discovered the following: 2.6 million counterfeit J-cards, 11,700 completed counterfeit cassette tapes, 40,000 partially-completed counterfeit cassette tapes, a wall of blank cassette tapes in boxes, an imprinter used to apply ink to cassettes, plates for use with the imprinter, a shrinkwrap machine, and tape duplicating machines which could produce thirty-one copies of a cassette tape every forty seconds.

Later that day, while the search was in progress, Jose drove up to the warehouse in the brown van. The van contained the following: a receipt for payment at the self-storage unit, a receipt for payment for 11,000 blank tapes signed by Jose, cassette tapes, library boxes, and a counterfeit J-card. The key to the brown van was on the same keychain as a key to the warehouse.

One of the four workers discovered at the warehouse, Antonio Casilla–Lopez, told agents and testified at trial that Jose Hernandez had originally brought Casilla from Los Angeles to Chula Vista, and had taught him how to use one of the machines at the warehouse. Casilla stated that he once took his pay from cash given to him by Jose. Casilla and another warehouse worker, Jorge Gonzalez–Gomez, testified that they knew they were engaged in a tape-counterfeiting operation.

Pedro and Jose Hernandez were indicted on March 28, 1990. The indictment charged conspiracy to traffic in counterfeit labels and goods, and criminal infringement of a copyright, in violation of 18 U.S.C. §§ 371, 2318–2320 (1988), and 17 U.S.C. § 506(a) (1988).

Jose Hernandez moved to sever his trial from Pedro's. In support of this motion, Pedro submitted an affidavit saying he would not take the stand in a joint trial, but that he would testify at Jose's separate trial that Jose was not involved in "my

business." Pedro owned a legitimate recording business, J.R. Records, to which he referred in his affidavit.[2] The district court denied Jose's motion. Jose and Pedro did not testify at their joint trial.

During the trial, Pedro Hernandez made a gesture which one juror interpreted as "a slit across his throat, a motion to the witness who was on the stand." The district court questioned the juror and instructed him to consider only the evidence, not the gesture. The court admonished the entire jury panel to consider only the evidence, and asked if there were any jurors who could not follow that instruction, to which there was no reply.

The jury convicted the Hernandezes on all counts. On September 14, 1990, Pedro and Jose Hernandez each were sentenced under the United States Sentencing Guidelines (the "Guidelines") to seventy-one months in prison. Jose and Pedro each timely filed a notice of appeal.

## II

■ Both Pedro and Jose claim there was insufficient evidence to sustain the verdicts against them. We "uphold [the] conviction[s] if, viewing the evidence in the light most favorable to the government, any rational trier of fact could have found the defendant[s] guilty beyond a reasonable doubt of each element of the crime[s] charged." *United States v. Sanchez–Mata*, 925 F.2d 1166, 1166 (9th Cir.1991). The government is also entitled to " 'all reasonable inferences which could be drawn from [the evidence], when viewed in the light most favorable to the government.' " *United States v. Davis*, 932 F.2d 752, 761 (9th Cir.1991) (citation omitted). There was sufficient evidence to sustain the verdicts.

There is no real dispute that a conspiracy existed to distribute counterfeit tapes and labels. Agents found a plethora of sophisticated counterfeiting equipment, 2.6 mil-

lion counterfeit J-cards, and 11,700 counterfeit tapes in the warehouse at 3802 Main Street. The workers discovered at the warehouse testified they knew they were involved in a counterfeiting operation. Viewed in the light most favorable to the government, *Sanchez–Mata*, 925 F.2d at 1166, the evidence reveals " '[t]he essential elements of a conspiracy ... (1) an agreement to engage in criminal activity, (2) one or more overt acts to implement the agreement, and (3) the requisite intent to commit the substantive crime' " of tape and label counterfeiting. *United States v. Marsh*, 894 F.2d 1035, 1039 (9th Cir.1989) (citation omitted), *cert. denied*, 493 U.S. 1083, 110 S.Ct. 1143, 107 L.Ed.2d 1048 (1990).

" 'Once the existence of a conspiracy is shown, evidence establishing beyond a reasonable doubt a knowing connection of the defendant with the conspiracy, even though the connection is slight, is sufficient to convict [him] of knowing participation in the conspiracy.' " *Id.* (alteration in original; citation omitted). The defendant must have had the intent to accomplish the illegal objective of the conspiracy. *United States v. Medina*, 940 F.2d 1247, 1250 (9th Cir.1991).

Pedro Hernandez signed the lease to the warehouse at 3802 Main Street. He was seen entering the warehouse more than once. On February 6, 1990, at the warehouse, Ralph Vaughan observed Pedro Hernandez load into his silver van cartons of library boxes containing cassettes in shrink wrap. Later that day, Vaughan observed Pedro load the same cartons into the self-storage unit at 2385 Main Street. Vaughan testified that this behavior was consistent with a tape counterfeiting operation.

Viewed in the light most favorable to the government, *Sanchez–Mata*, 925 F.2d at 1166, this evidence establishes that Pedro Hernandez was connected to the conspiracy, and that he knowingly intended to

---

**2.** Pedro's affidavit reads in relevant part:

   5. I am in business in which I sell stereo equipment, blank tapes, and distribute recorded music cassettes under the label Junior Recording [J.R. Records].

   6. My brother, Jose Hernandez, has never been an employee of mine, and has never worked in my business.

further its illegal objectives. We find there was sufficient evidence to support his conviction.

The evidence also showed Jose Hernandez was connected to the conspiracy. As Jose admits in his brief:

> [v]iewing the evidence in the light most favorable to the government, Jose: (1) was present at the factory warehouse a number of times over a three month period, (2) carried boxes from the warehouse, (3) had a key to the warehouse, (4) drove workers to the warehouse, (5) gave money to a worker at the warehouse, (6) showed the machines to a worker at the warehouse, (7) frequently used the ministorage facility to store the tapes from the warehouse and, (8) lived next door to the distribution point.

Brief for Appellant Jose Hernandez at 19.

In addition, the evidence showed: on the day the search warrants were executed, Jose arrived at the warehouse driving the brown van; in the van was a receipt for payment at the self-storage unit, a receipt for payment for 11,000 blank tapes signed by Jose, and a counterfeit J-card.

Jose's central claim is that he lacked the knowledge and intent necessary to join the conspiracy. We reject this claim because the evidence establishes a knowing link between Jose and the counterfeiting conspiracy, and supports a reasonable inference that Jose knew he was involved with an illegal counterfeiting venture.

"Intent may be inferred from objective facts and the actions of the defendant." *United States v. Birges*, 723 F.2d 666, 672 (9th Cir.1984), *cert. denied*, 466 U.S. 943, 104 S.Ct. 1926, 80 L.Ed.2d 472 (1984), 469 U.S. 863, 105 S.Ct. 200, 83 L.Ed.2d 131 (1984). Three of Jose's actions support the inference that he knew he was involved in an illegal enterprise.

First, Jose had control over some of the counterfeit tapes, and had a key to the warehouse. He often signed the log at the self-storage facility. Control over contraband may contribute to an inference of knowledge of illegality. *See United States v. Rodriguez*, 761 F.2d 1339, 1341 (9th Cir. 1985).

Second, one of the warehouse workers testified that Jose showed him how to use the tape duplicating machines. The tapes in the warehouse had copyright labels on them. The warehouse workers knew they were involved in a counterfeiting operation. It is not unreasonable to assume that Jose read some of the labels and knew he was involved in an illegal enterprise. *See Davis*, 932 F.2d at 761. The evidence supports a reasonable inference that Jose knew the operation was illegal, and joined in it to further its goals. *See United States v. Gillock*, 886 F.2d 220, 222 (9th Cir.1989).

Third, Jose helped transport counterfeit tapes to the self-storage unit. As the government points out, "[t]he fact that Jose Hernandez transported the cassettes to the self-storage unit for distribution can be seen as evidence of his knowledge of the need to keep secret the location of the manufacturing operation." Brief for Appellee at 26–27. We affirm Jose's conviction.

### III

In the district court, Jose moved to sever his trial from Pedro's trial. On appeal, Jose argues the district court erred in denying him a separate trial because he was: (1) denied access to Pedro's testimony; (2) found guilty because he is Pedro's brother; and (3) prejudiced by Pedro's antagonistic defense.

■ "Generally speaking, defendants jointly charged are to be jointly tried. This is also the rule in conspiracy cases." *United States v. Escalante*, 637 F.2d 1197, 1201 (9th Cir.1980) (citation omitted), *cert. denied*, 449 U.S. 856, 101 S.Ct. 154, 66 L.Ed.2d 71 (1980); *see* Fed.R.Crim.P. 8. However, Fed.R.Crim.P. 14 "provides that, at the discretion of the trial judge, a severance may be ordered when it appears that a defendant may be significantly prejudiced by a joint trial with codefendants." *Escalante*, 637 F.2d at 1201. As this language indicates, we review for abuse of discretion the district court's decision to deny Jose's motion for severance. *United States v.*

*Patterson,* 819 F.2d 1495, 1501 (9th Cir. 1987).

In general,

[t]he party seeking reversal of a decision denying severance under Rule 14 has the burden of proving "clear," "manifest," or "undue" prejudice from the joint trial. Such a party must show more than that a separate trial would have given him a better chance for acquittal. He must also show violation of one of his substantive rights by reason of the joint trial.... In other words, the prejudice must have been of such magnitude that the defendant was denied a fair trial. Clearly, this is not an easy burden to meet.

*Id.; see United States v. Sherlock,* 865 F.2d 1069, 1078 (9th Cir.1989).

■ First, Jose argues severance was mandated because Pedro's testimony was available only at a separate trial. According to his affidavit, Pedro would have testified at a severed trial that Jose was not involved in Pedro's business, presumably J.R. Records.[3] Pedro's affidavit also indicated Jose was an unsophisticated political prisoner, too unsophisticated to understand he was involved in a counterfeiting operation.

■ "When the reason for severance is the need for a codefendant's testimony, defendant [sic] must show [1] that he would call the codefendant at a severed trial, [2] that the codefendant would in fact testify, and [3] that the testimony would be favorable to the moving party." *United States v. Jenkins,* 785 F.2d 1387, 1393 (9th Cir.1986), *cert. denied sub nom. Prock v. United States,* 479 U.S. 855, 107 S.Ct. 192,

93 L.Ed.2d 125 (1986), *cert. denied sub nom. White v. United States,* 479 U.S. 889, 107 S.Ct. 288, 93 L.Ed.2d 262 (1986). In addition, the defendant may have to show [4] that the codefendant's testimony would not be cumulative. *See United States v. Hoelker,* 765 F.2d 1422, 1425 (9th Cir.1985) (cumulative nature of testimony discussed in multi-factor analysis), *cert. denied,* 475 U.S. 1024, 106 S.Ct. 1219, 89 L.Ed.2d 330 (1986).

■ Further, in deciding whether to grant a motion for severance, "[t]he district court must ... consider the weight and credibility of the proposed testimony and the economy of severance." *United States v. Castro,* 887 F.2d 988, 998 (9th Cir.1989). "Severance is rarely granted on th[e] ground" that a codefendant's testimony was excluded, *Hoelker,* 765 F.2d at 1425, primarily because "[c]onsiderations of judicial economy merit serious attention when defendants move for severance." *United States v. McDonald,* 576 F.2d 1350, 1355 (9th Cir.1978), *cert. denied sub nom. Stewart v. United States,* 439 U.S. 830, 99 S.Ct. 105, 58 L.Ed.2d 124 (1978), *cert. denied sub nom. Besbris v. United States,* 439 U.S. 927, 99 S.Ct. 312, 58 L.Ed.2d 320 (1978).

"The Government does not dispute that Jose Hernandez has met two of the criteria set forth: he established that he would call his brother [Pedro] to testify at a separate trial and that his brother would, in fact, testify. However, the issue is whether the codefendant's testimony would have been favorable, and if so, not cumulative." Brief for Appellee at 39.

---

**3.** In his brief, Jose claims Pedro would have testified Jose was not involved in the counterfeiting operation. . This assertion is based on counsel's representation that Pedro would testify that Jose "never worked for [Pedro] nor with [Pedro] in any of his businesses...." However, Pedro's counsel also stated Pedro would testify "he is a businessman in legitimate businesses only." Given this representation, and the fact that Pedro's affidavit discusses only his legitimate business, J.R. Records, we reject Jose's claim that Pedro would have testified Jose was not involved in the counterfeiting operation.

Indeed, had Pedro testified Jose was not involved in the counterfeiting operation, he might

have been subject to prosecution for perjury. In this regard, we note the following language from *United States v. Gay,* 567 F.2d 916 (9th Cir.1978), *cert. denied,* 435 U.S. 999, 98 S.Ct. 1655, 56 L.Ed.2d 90 (1978): "a severed co-defendant, following his own trial, may be more inclined to 'throw a bone' to his co-defendants once his own case has been disposed of and he has nothing to lose by testifying. We are assuming for present purposes that [the co-defendant's] testimony, in any stage of the proceedings, would have been truthful." *Id.* 567 F.2d at 920 n. 6 (citation omitted).

Judging by his affidavit, Pedro's main contribution would have been to distance Jose from Pedro's legitimate business, J.R. Records. However, the counterfeiting ring was separate from Pedro's legitimate business. There was no indication at trial that Jose was involved with J.R. Records. The testimony as to Pedro's association with J.R. Records lacked probative value as to the offenses charged.

Pedro's testimony also would have addressed Jose's lack of sophistication. This line of testimony would have supported Jose's "fundamental challenge to this prosecution: that ... Jose Hernandez [did not] ... possess[ ] the specific intent to violate the copyright and trademark laws." Reply Brief for Appellant Jose Hernandez at 3. This testimony might have helped Jose. However, the trial court did admit the testimony of a handwriting expert who stated Jose had a "low skill level." Pedro Hernandez's brother-in-law, Fernando Saucedo, testified he had the "impression" that Jose was not very well educated. Pedro's own testimony regarding Jose's education and sophistication would have been at least partly cumulative.

We affirm the district court's denial of Jose's motion for severance. The fact that the trial court's decision "perhaps reduced [Jose's] chance for acquittal ... does not demonstrate a need for severance...." *United States v. Ramirez*, 710 F.2d 535, 547 (9th Cir.1983). Pedro's testimony would not have been so helpful that its absence rendered Jose's trial " 'so manifestly prejudicial as to require the trial judge to exercise [her] discretion in but one way, by ordering a separate trial.' " *Patterson*, 819 F.2d at 1501.

■ Second, Jose argues the district court erred in denying him a separate trial because "the jury likely found [Jose] guilty simply by his familial association with" Pedro. Jose argues that the jury must have had difficulty separating the evidence against Pedro from the evidence against him, and that he was found guilty based on a spillover effect.

We reject Jose's second argument. "Judicial economy justifies reliance on the jury to follow the instructions of the court that segregate the evidence and limit the applicability of the evidence to each defendant." *United States v. Vaccaro*, 816 F.2d 443, 448 (9th Cir.1987), *cert. denied sub nom. Alvis v. United States*, 484 U.S. 914, 108 S.Ct. 262, 98 L.Ed.2d 220 (1987). "The prejudicial effect of evidence relating to the guilt of codefendants is generally held to be neutralized by careful instruction by the trial judge." *Escalante*, 637 F.2d at 1201. In this case, the trial judge instructed the jury to ignore the family relationship between Pedro and Jose, and to segregate the evidence. Jose has not demonstrated "clear or manifest prejudice from the joint trial, and consequently the ruling of the trial judge should be affirmed." *Escalante*, 637 F.2d at 1202.

■ Third, Jose argues that severance from Pedro was required because their defenses were antagonistic. This argument also lacks merit. "To obtain severance based on [the] ground [of antagonistic defenses], defendants must show that 'the acceptance of one party's defense will preclude the acquittal of the other party.' " *Sherlock*, 865 F.2d at 1081 (citation omitted). In this case, both Pedro and Jose argued they were not guilty; these defenses were not mutually exclusive. Indeed, as noted above, Pedro submitted an affidavit to the district court in an attempt to demonstrate Jose's need for Pedro's testimony.

### IV

■ During the trial, a juror reported he observed Jose make "a slit across his throat, a motion to the witness who was on the stand." The court and counsel agreed that "[i]t could have been a threat." The court questioned the juror, and he described what he had seen and noted on his own, "I'm told to look at the facts, so I was just going to assume that—let's take that as a scratch or an itch."

After a discussion with counsel, the court admonished the juror:

> THE COURT: .... the only evidence in the case you can consider is the evidence from the witness stand, physical items of

evidence received. And that's, of course, because something like a gesture that you described—or say a facial gesture I may make. Say I make a facial gesture, that could be a reflection of the testimony, like, yes, I don't believe it. It also could be the fact that I hit the wrong key on my computer, and the computer screen went blank, which I did once yesterday.... Any gesture or expression of anybody could have several meanings.... So because they could be as indicative of—as consistent with innocence as with guilt, it's that's [sic] the reason we can't consider them.

JUROR KELLY: I completely understand....

....

THE COURT: ... if I admonish you not to consider that, could you follow that admonition?

JUROR KELLY: Sure.

THE COURT: Any doubt in your mind?

JUROR KELLY: No doubts.

The court admonished the entire jury in a similar fashion. The heart of the admonition was as follows: "[a]ny body language or facial gestures that you may see of the Court or the Defendants or the attorneys or my Court staff is not evidence and can't be considered when you're making your decision." The court inquired: "[n]ow, are there any of you who feel you can't follow that admonition?" There was no audible response.

Without the jury present, the court instructed Jose not to sit facing the jury, and not to make any more threatening gestures. The court informed defense counsel: "[y]our client can sit wherever he wants. You can either go back in that L [-shaped table] or you can all sit in the same long row, whatever you want."

Jose claims the district court "should have declared a mistrial because, by forcing Jose to take another seat the judge implicitly found that there was a possibility the gesture could have an effect on the witness testimony and thus could have affected the verdict." In essence, Jose objects because his gesture and the district court's reaction to it may have affected the jury's verdict.

A threshold question is whether Jose adequately preserved his objection to the possibility that the gesture influenced the jury's verdict. Jose did object to the failure to substitute for Juror Kelly, but he did not move for a mistrial, and did not request the court to admonish the entire jury. (Indeed, Jose requested the court not to instruct the jury regarding his gesture.) The government claims we should review for plain error the district court's failure to grant a mistrial because Jose did not request a mistrial below. In his opening brief, Jose appears to concede plain-error review is appropriate, although in his reply brief he claims he preserved the issue for appeal.

In these circumstances, we review for plain error. *See United States v. Verdugo–Urquidez*, 939 F.2d 1341, 1344 n. 2 (9th Cir.1991) (discussing "our general rule that we do not consider issues raised for the first time on appeal," and noting "an appellant may not raise an issue in a reply brief if he has failed to discuss it in his opening brief"); Fed.R.Civ.P. 52(b) ("Plain errors ... may be noticed although they were not brought to the attention of the court"). Plain error is highly prejudicial error affecting substantial rights. *Castro*, 887 F.2d at 992–93. It was not plain error for the district court to continue the trial after Jose's gesture.

Indeed, even if Jose did preserve the issue for appeal, he is not entitled to a new trial.

> The defendant is entitled to a new trial if ... [there is] a 'possibility that ... extrinsic material could have affected the verdict.'.... [T]he trial judge's determination must be considered in the context of the entire record. We conduct an independent review of the alleged juror misconduct [in considering the extraneous evidence], but remain mindful of the trial court's conclusions.

*United States v. Bagnariol*, 665 F.2d 877, 885 (9th Cir.1981), *cert. denied sub nom. Walgren v. United States*, 456 U.S. 962, 102 S.Ct. 2040, 72 L.Ed.2d 487 (1982); *see*

*United States v. Steele,* 785 F.2d 743, 746 (9th Cir.1986) (quoting and following *Bagnariol* ).

In this case, the district court questioned Juror Kelly, and admonished the entire jury to ignore any gestures or body language. Given the evidence against Jose, and viewed in the context of the entire trial, the trial judge's conclusion that Jose's gesture would not affect the jury's verdict was reasonable.

## V

█ Jose and Pedro were sentenced under the Sentencing Guidelines. At sentencing, the district court calculated a probable or intended loss of $10,454,400 by using a $4 per-tape estimate for 2,613,600 J-cards (2.64 million J-cards found at the warehouse, minus 1% predicted defective or broken cards). The court used the $4 figure to reflect the average market value of the tapes counterfeited.

Under section 2F1.1 of the Guidelines, the district court is to use the " 'probable or intended' " loss resulting from the crime or attempt, not the actual loss sustained. *United States v. Davis,* 922 F.2d 1385, 1391 (9th Cir.1991). Thus the district court's use of the 2,613,600 J-cards was appropriate, even though the counterfeiting operation did not actually produce or sell that many tapes.[4]

The amount of loss calculated ordinarily should reflect the estimated market value of the goods. *Davis,* 922 F.2d at 1392. The Hernandezes each agree that the cheapest tapes found at the warehouse had an estimated market value of between $2.99 and $4.99. Thus the $4 figure appears appropriate as an estimate of market

value; in any case, it was not clear error. *See Davis,* 922 F.2d at 1388. The Hernandezes do not challenge the district court's mathematical calculations ($4 × 2,613,600 J-cards = $10,540,000 intended loss), or the imposition of the seventy-one-month sentence based on that intended loss. *See* U.S.S.G. § 2B1.1.

█ The Hernandezes' central claim is that the district court calculated their sentences using the *market value* of the tapes, when it should have used the *profit* lost by the victim, the recording industry. We review de novo this legal issue relating to the Guidelines. *United States v. Wilson,* 900 F.2d 1350, 1355 (9th Cir.1990). In an ordinary theft case, this issue does not arise: when a tangible item is stolen, its value is relatively easy to determine.

A copyright is an intangible item, and its value is harder to determine. The application notes to the Guidelines state: "[t]he value of property taken plays an important role in determining sentences ... because it is an indicator of both the harm to the victim and the gain to the defendant." U.S.S.G. § 2B1.1, application notes. Profit, not market value, indicates loss to the recording industry and gain to the defendants in this case.

However, the Guidelines note that "[t]he loss need not be determined with precision, and may be inferred from any reasonably reliable information available." U.S.S.G. § 2B1.1, application notes. *See Wilson,* 900 F.2d at 1356 ("where goods have no readily ascertainable market value, any reasonable method may be employed to ascribe an equivalent monetary value to the items"). According to their own expert, the Hernandezes' method would have

---

**4.** Although some of the tapes to be counterfeited were apparently Mexican, all of the J-cards admitted at trial had copyright language printed on them either in English or in Spanish. Under 17 U.S.C. § 104 (1988), the country of origin is irrelevant; if the work is copyrighted in the United States or Mexico, it is protected by United States law. *See New York Chinese v. U.E. Enterprises,* 1989 WL 22442, *5, 1989 U.S.Dist. LEXIS 2760 *19–20 (S.D.N.Y. March 8, 1989) ("Section 104(b)(1) grants copyright protection to works authored by citizens or domiciliaries of a 'foreign nation that is a party to a copyright

treaty to which the United States is also a party.' Section 104(b)(2) grants copyright protection if the work is first published in the United States or in a foreign nation that, on the date of first publication, is a party to the Universal Copyright Convention"). Mexico became a party to the revised Universal Copyright Convention on October 31, 1975; the United States became a party to the Convention on July 10, 1974. *See* Universal Copyright Convention, *done* July 24, 1971, 25 U.S.T. 1341, 943 U.N.T.S. 178, *reprinted in* 17 U.S.C.A. § 104 (West Supp.1991).

required detailed information and complex economic calculations.

Using microeconomic theory, you could estimate the loss in profits to the industry which would be the proper loss measure.... You'd need to have some information on the market definitions. You'd have to define the market. Is the market an individual title, a class of music, or all cassette tapes? So once that's determined.... [Y]ou have to know something about the market structure; the types of the number [sic] and the relative size of the firms, the importance of the firms. Is it monopoly, oligopoly, etc., etc. You need to know something about the equilibrium price and quantity in your market. You need to know something about elasticity of demand and supply curves, how important are royalties relative to production costs relative to shipping costs relative to storage costs, etc., etc., so you need to know a lot of information to do this.

Testimony of Mark Thayer, Professor of Economics at San Diego State University. Although Professor Thayer's microeconomic approach theoretically might produce quite accurate results, the Guidelines do not require such precision, which could only be pursued in a lengthy and complex hearing. *See Wilson*, 900 F.2d at 1356; U.S.S.G. § 2B1.1, application notes.

Market value of counterfeited tapes is a reasonable value to use in a copyright case. Four dollars was not an unreasonable estimate of market value. We affirm the Hernandezes' sentences.

## VI

As an offshoot of his argument concerning the sufficiency of the evidence used to convict him, Jose claims the district court erred in sentencing him under the Guidelines as a "manager" of criminal activity. To prevail, he must show the district court clearly erred in finding by a preponderance of the evidence that he was "an organizer, leader, manager, or supervisor under section 3B1.1 of the Guidelines." *United States v. Mares–Molina*, 913 F.2d 770, 773 (9th Cir.1990).

Factors the court should consider [in determining whether the defendant was a "manager"] include the exercise of decisionmaking authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

*Id.*

The district court explained its decision to sentence Jose as a manager.

The question is whether it's fair to give Jose Hernandez manager points [under the Guidelines] and, again, I find that clearly he—the evidence establishes he was like an on-site—or he was like the manager, not always on site but often on site. He certainly, according to the evidence, recruited and hired two of the illegal aliens [warehouse workers]. He brought them to San Diego. He basically explained to them what they were to do. There's also evidence that he is the person that gave instructions to them, transported them back to the place where they were staying from time to time, and essentially explained how it operated. So under the circumstances, I find that it was appropriate ... in fact to give to Jose Hernandez the manager points.

Given the low burden of proof required for sentencing, and our limited standard of review, we affirm Jose's sentence.

## VII

Accordingly, we conclude that there is sufficient evidence to sustain the verdicts against the defendants. We also conclude that the district court did not err in denying the motion to sever or in failing to order a mistrial. Finally, we conclude that the district court correctly calculated the amount of loss caused by the defendants and correctly found Jose Hernandez to be a manager of the criminal activity for which he was convicted.

Consequently, the judgment of the district court is

AFFIRMED.