65 F.3d 177
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
Wesley Lyle TSCHIRGI, Defendant-Appellant.
 No. 94-30407.
 United States Court of Appeals, Ninth Circuit.
 Submitted Aug. 11, 1995.*
Decided Aug. 24, 1995.
 
 1
 Before: BEEZER and HAWKINS, Circuit Judges and TEVRIZIAN, District Judge.**
 
 
 2
 MEMORANDUM***
 
 
 3
 On April 17, 1994, Appellant Wesley Tschirgi ("Tschirgi"), was arrested on a multi-defendant complaint. Tschirgi was charged with conspiracy in an illegal card-marking ring which operated at the blackjack tables of the Lummi Indian Casino ("Lummi Casino") from August 1992 through April 17, 1994.
 
 
 4
 On August 9, 1994, Tschirgi pleaded guilty to an Amended Felony Information, charging a violation of 18 U.S.C. Sec. 371, for conspiracy to violate 18 U.S.C. Sec. 1952(a)(3), travel in interstate commerce in aid of a racketeering enterprise; 18 U.S.C. Sec. 2314, transportation in interstate commerce of stolen money in excess of $5,000; and 18 U.S.C. Sec. 1163, theft in excess of $100 from an Indian tribal organization.
 
 
 5
 The District Court for the Western District of Washington found the loss to the Lummi Casino to be greater than $800,000, which warrants a 13 level increase. The district court also found that a four level upward adjustment was appropriate with respect to Tschirgi's leadership role in the conspiracy. Tschirgi was sentenced to forty-one months' imprisonment and is currently incarcerated.
 
 
 6
 Tschirgi contends that arithmetic errors show that the loss to the Lummi Casino did not exceed $800,000 and at a minimum the court should have granted a rehearing on his sentencing. Tschirgi also alleges that the facts in the record do not support an upward adjustment for a leadership role in the offense because Tschirgi did not have a leadership role.
 
 
 7
 * In June 1992, Larry Thompson and Richard Riolo met and conspired to devise a scheme and organization to defraud the Lummi Casino by removing playing cards from the Lummi Casino, marking them on the backside with a substance only visible to the trained eye, re-introducing them back into the casino, and causing them to be played at specific high stakes blackjack tables. Many experienced blackjack players who knew how to read the markings were recruited to come on one or more occasions to the Lummi Casino in order to carry out the conspiracy.
 
 
 8
 The scheme required playing cards to be removed from the Lummi Casino by Larry Thompson and Frankie Thompson who were employed at the Lummi Casino as shift manager and floor supervisor, respectively. They commenced removing the cards no later than September 1992. The removed cards were given to Tschirgi who marked the cards and subsequently returned the marked cards to two Lummi Casino employees who introduced the marked cards onto the blackjack tables for play.
 
 
 9
 In December 1993, Gerald "Joe" Rogers ("Rogers"), who was employed as a floor supervisor/pit boss by the Lummi Casino, joined the illegal gambling operation by knowingly returning marked cards into the podiums in which the playing cards were kept. Thereafter, Rogers introduced the marked cards onto the blackjack tables where the co-conspirator blackjack players were playing.
 
 
 10
 Tschirgi arrived in Bellingham, Washington in July 1992 and rented an apartment on September 20, 1992 for the sole purpose of carrying out the conspiracy. The undisputed factual record shows that Tschirgi was responsible for marking the cards, he recruited at least one blackjack player, helped coordinate the scheduling for the blackjack players, and played blackjack in furtherance of the conspiracy at least 19 different times. These facts are supported by Tschirgi's own admissions and transcripts from nine conversations between Tschirgi and other co-conspirators obtained pursuant to court-authorized wire taps.
 
 
 11
 At the time of Tschirgi's arrest, a passport issued in a false name along with $8,576.00 in cash were seized from his residence. A search of a storage facility leased to Tschirgi and Ms. Cohen uncovered red and blue colored dyes, compressors, numerous decks of cards (both marked and unmarked), fans, graphite tape, and other card-marking materials, all of which were seized.
 
 
 12
 Tschirgi admits that he was involved in discussions concerning when particular out-of-town players should play and at which tables. Tschirgi also received an equal share of the proceeds from the scheme with Mr. Riolo, Mr. Whitson, and the out-of-town player which amounts to 18.75 percent of the total winnings. The other 25 percent of the proceeds went to Mr. Thompson while others, such as Mr. Rogers, received a flat fee. Tschirgi concedes that he was involved in the group's decision-making regarding various technical aspects of the conspiracy.
 
 II
 
 13
 The district court had jurisdiction over the criminal prosecution of the conspiracy to defraud the Lummi Casino under 18 U.S.C. Sec. 3231. A final judgment in this criminal case was entered on October 19, 1994. Fed.R.Cr.P. 32. This Court has jurisdiction over this appeal pursuant to 18 U.S.C. Sec. 3742 and 28 U.S.C. Sec. 1291.
 
 
 14
 We must review the district court's factual findings for clear error and its interpretation of the Sentencing Guidelines de novo. United States v. Leung, 35 F.3d 1402, 1405 (9th Cir.1994).
 
 III
 
 15
 The controversy in this case is rooted in a dispute over whether the conspiracy to defraud the Lummi Casino caused a loss of greater than $800,000 for sentencing purposes under 18 U.S.C. Sec. 371. 18 U.S.C. Sec. 371 states:
 
 
 16
 If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both.
 
 
 17
 Section 2B1.1 of the Sentencing Guidelines is also applicable to the determination of the amount of loss. Section 2B1.1 provides for a base offense level of 4 and an increase of 13 levels if the loss is more than $800,000 and less than $1,500,000. See U.S.S.G. Sec. 2B1.1. The Commentary to Section 2B1.1 provides that:
 
 
 18
 For the purposes of subsection (b)(1), the loss need not be determined with precision. The court need only make a reasonable estimate of the loss, given the available information. This estimate, for example, may be based upon the approximate number of victims and the average loss to each victim, or on more general factors such as the scope and duration of the offense.
 
 
 19
 U.S.S.G. Sec. 2B1.1, Comment. (n. 3).
 
 
 20
 This Court must use "a realistic, economic approach to determining what losses [Tschirgi] truly caused or intended to cause". United States v. Harper, 32 F.3d 1387, 1392 (9th Cir.1994). The guidelines admonish that the courts must make an attempt to determine the realistic "value". Id.
 
 
 21
 The findings by the district court are more than sufficient to show that the amount of loss to the Lummi Casino exceeded $800,000. The district court found that "there is no question ... that the government's methodology is sufficiently reliable to demonstrate that the loss involved exceeds $800,000." The district court accurately concluded that, "[T]he only figures ... being offered with any precision are the government's figures [and] even if [the court] looks at the government's figures with skepticism, there's just too much corroboration." The district court appropriately weighed the statements made by co-conspirator Riolo with the loss figures from the video surveillance logs to find that, "[t]here's just no way that $800,000 doesn't apply on this, and the court has no problem in finding that the government's methodology is reliable and is sufficiently precise to meet the preponderance of the evidence standard."
 
 
 22
 On appeal, this Court must look at the most credible evidence to determine an economically feasible figure. Harper, 32 F.3d at 1392. An economically reasonable figure is reached by looking at evidence which shows the loss attributable solely to the play of the conspirators, rather than looking at the profit margin figures of the casino as a whole. There are also some estimates which do not provide a realistic value.
 
 
 23
 First, Tschirgi relies upon the figures from the table loss reports as evidence that the amount of loss does not exceed $800,000. The table loss reports are not reliable because they only account for large winnings, leaving regular cash outs of Tschirgi and his co-conspirators unaccounted for. The table loss reports are also the responsibility of the floor supervisor. Thus, co-conspirators Larry Thompson, Frankie Thompson, and Joe Rogers were responsible for filling out some of these reports which make the losses reflected on those reports questionable and unreliable.
 
 
 24
 Second, Tschirgi relies upon the comptroller's report, which he asserts shows that the loss to the Lummi Casino was only $601,431. On the other hand, the government uses the comptroller's report to show that the loss exceeded $2,000,000. The differing figures reached by analyzing the comptroller's report are irrelevant. The figures in the comptroller's report are reached by focusing on the casino's profit from blackjack during the time period of August 1992 through April 1994, including profits from non-conspirators. We find that this figure is vague at best because there are many other factors and variables that may explain why the casino performed as it did during the perpetration of the conspiracy. We also note that, the district court based its findings on the video surveillance logs and the statements made on the wire taps, and not on the comptroller's report or the table loss reports. ER 14, p. 2.
 
 
 25
 The video surveillance logs provide another method of estimating the loss. The video surveillance logs are credible because they focus solely on the conspirator's winnings and leave no room for tampering. The surveillance logs were maintained by the Lummi Casino surveillance technicians and focused on the conduct of the conspirators who actually played blackjack as well as the activities of Rogers and Thompson with respect to their handling of Lummi cards and contact with other conspirators. These logs were analyzed by Special Agent Ramon E. Garcia of the Federal Bureau of Investigation ("FBI") in order to calculate the loss figures. Special Agent Garcia testified that he could read the currency denominations on the video logs, and the figures obtained from the surveillance logs are undisputed.
 
 
 26
 The video surveillance logs evidence the losses to the Lummi Casino from December 30, 1993 through April 17, 1994. The government contends that there were nine weekends of gambling during this time frame. However, the government counts the period of December 30, 1993 through January 10, 1994 as one weekend when it is in fact two weekends. Thus, there was a total of ten weekends of gambling during this period. These logs show a loss attributable to the conspiracy of $300,146 for the total surveillance period. Since there were ten weekends where the conspirators gambled during the surveillance period, there was an average loss of $30,014.60 per weekend during this period. The loss total could be as high as $2,221,080.40, if the $30,014.60 average loss was multiplied by the 74-week duration of the scheme. Since Sec. 2B1.1 states: "[t]he court need only make a reasonable estimate of the loss, given the available information," this figure is sound and is the most economically and mathematically realistic value. U.S.S.G. Sec. 2B1.1, Comment. (n. 3).
 
 
 27
 The losses indicated by analyzing the video surveillance logs are also substantiated by verbal statements made by co-conspirator Richard Riolo. During a court-authorized wire-tap in March of 1994, Mr. Riolo stated that the conspiracy was taking in $80,000 to $100,000 per month. Mr. Riolo's statements are credible because he made them in private to a co-conspirator. The statement was not tampered with and it provides certainty because Mr. Riolo was one of the leaders of the conspiracy and he was speaking with a fellow co-conspirator about the success of the scheme. Using this figure as a basis for a realistic estimate, the total loss to the Lummi Casino is between $1,600,000 and $2,000,000 over the 74-week period of the scheme's operation.
 
 
 28
 It is the probable loss resulting from the conspiracy, however, not the actual loss, that a district court must determine for sentencing purposes. United States v. Mullins, 992 F.2d 1472, 1479 (9th Cir.1993), citing United States v. Hernandez, 952 F.2d 1110, 1118 (9th Cir.1991) (citing U.S.S.G. Sec. 2F1.1 (Nov. 1989)). Since the "loss need not be determined with precision and may be inferred from any reasonably reliable information available," and the video surveillance logs and Mr. Riolo's statements are the most credible information, it is clear that Tschirgi's conspiracy caused a loss of greater than $800,000 to the Lummi Casino. Id.
 
 IV
 
 29
 In deciding an enhancement of two to four levels, this Court must determine whether Tschirgi "was an organizer, leader, manager, or supervisor pursuant to Section 3B1.1 of the Sentencing Guidelines". United States v. Mares-Molina, 913 F.2d 770, 773 (9th Cir.1990). This determination involves a "question of fact reviewable under the clearly erroneous standard". Id., citing United States v. Sanchez, 908 F.2d 1443, 1447 (9th Cir.1990), United States v. Carvajal, 905 F.2d 1292, 1295 (9th Cir.1990).
 
 
 30
 Tschirgi asserts that the government failed to prove by a preponderance of the evidence to the district court that Tschirgi was a leader. Tschirgi contends that he was a manager/supervisor and should consequently be given a 3-level upward adjustment rather than a 4-level upward adjustment for being a leader. To distinguish between a leadership role and a manager/supervisor role, we must look for some degree of control or organizational authority over the other co-conspirators in order for Section 3B1.1 of the Sentencing Guidelines to apply. Id. The relevant factors to consider:
 
 
 31
 include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others. There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy".
 
 
 32
 U.S.S.G. Sec. 3B1.1 (n. 1, 4).
 
 
 33
 The district court concluded that there were several leaders of the conspiracy: Messrs. Riolo and Tschirgi and the two Thompsons. The district court also found that there were several leaders in this conspiracy and that Tschirgi's role in the offense warranted a four point increase to a supervisory and leadership role.
 
 
 34
 The conclusion that Tschirgi held a leadership role is supported by the evidence produced and weighed by the district court at trial. First, Tschirgi concedes that he was involved in the decision of when particular out-of-town players should play and at which tables they were to play. Second, a substantial sum was secured by Tschirgi since he split seventy-five percent of the proceeds from the winnings with three other individuals. His "take" amounted to 18.75 percent of the total income of the conspiracy. Third, the fact that he was taking a percentage coupled with the fact that he was responsible for marking the cards, which was essential to the success of the scheme, supports the conclusion that he was one of the leaders. The factual record shows that Tschirgi recruited at least one player, was responsible for the schedules of the players, rented out an apartment at the inception of the scheme for the sole purpose of perpetrating the conspiracy, and was involved in many telephone conversations where other conspirators reported to him concerning the success of the scheme. In addition, Tschirgi had to exert authority and demonstrate leadership by settling a payment dispute between Riolo and Rogers.
 
 
 35
 The evidence strongly supports the district court's finding that Tschirgi was an integral participant in every phase of the conspiracy and that he, along with a couple of other co-conspirators, helped to plan, organize, and exercise control over the conspiracy. We find that the government has carried its burden of proof in showing that Tschirgi was a leader. The factual findings show that there was no clear error committed by the district court and that the plan to defraud the Lummi Casino would not have been possible but for Tschirgi's participation.
 
 
 36
 Since Tschirgi was "responsible for organizing others for the purposes of carrying out the crime," the district court was correct in its finding that Tschirgi was a leader. Mares-Molina, 913 F.2d at 773. Thus, the district court properly found that Tschirgi should receive the four level upward adjustment given the low burden of proof required for sentencing and our limited standard of review. United States v. Hernandez, 952 F.2d 1110, 1119 (9th Cir.1991).
 
 V
 
 37
 The order denying Tschirgi a sentencing rehearing is not an issue here. Tschirgi claims that there must be a sentencing rehearing because the comptroller's report indicated the loss to the Lummi Casino was less than $800,000 and that Tschirgi has the right to not be sentenced "based upon materially false information". United States v. Wilson. 900 F.2d 1350, 1352 (9th Cir.1990). However, as discussed earlier, the district court did not rely upon the comptroller's report to make its decision concerning loss. Instead, the district court used the video surveillance logs and the statements made by Mr. Riolo which do not serve as a basis for a sentencing rehearing. Consequently, there was no error in denying the motion for a sentencing rehearing.
 
 
 38
 AFFIRMED.
 
 
 
 *
 The panel unanimously finds this case suitable for decision without oral argument. Fed.R.App.P. 34(a); Ninth Circuit Rule 34-4
 
 
 **
 The Honorable Dickran M. Tevrizian, Jr., United States District Judge for the Central District of California, sitting by designation
 
 
 ***
 This disposition is not appropriate for publication and may not be cited to or used by the courts of this circuit except as provided by Ninth Circuit Rule 36-3